In re the **DREXEL BURNHAM LAMBERT GROUP, INC.,** Debtor.

**Saul S. COHEN, Plaintiff,**

v.

The **DREXEL BURNHAM LAMBERT GROUP, INC., Defendant.**

**Bankruptcy No. 90B–10421. Adv. No. 91–5359A.**

United States Bankruptcy Court, S.D. New York.

Feb. 26, 1992.

P. Gruenberger, and J. Forster, Weil, Gotshal & Manges, New York City, for debtor, defendant Drexel Burnham Lambert Group, Inc.

H. Edelman, Kaye, Scholer, Fierman, Hayes & Handler, New York City, for plaintiff Saul Cohen.

## AMENDED MEMORANDUM OF DECISION ON EMPLOYMENT AGREEMENT

FRANCIS G. CONRAD, Bankruptcy Judge, Sitting by Special Designation.

### INTRODUCTION

Resolution of the competing motions for summary judgment before us in this adver-

sary proceeding[1] requires us to venture into the thicket that is "executory contracts," where, says one commentator, "lurks a hopelessly convoluted and contradictory jurisprudence." Andrew, *Executory Contracts Revisited: A Reply to Professor Westbrook*, 62 U.Colo.L.Rev. 1, 1 (1991). Our expedition through the present, bramble-filled thicket persuades us that, in the words of another commentator, in no area of bankruptcy "has the law become more psychedelic than in the one titled 'executory contracts.'" Westbrook, *A Functional Analysis of Executory Contracts*, 74 Minn.L.Rev. 227, 228 (1989). Thus, we leave the thicket unable to find there the answers to the issues raised by the parties. Instead, we rely heavily on the careful scholarship of the above-quoted law school professors, Michael T. Andrew and Jay Lawrence Westbrook, and abandon the traditional focus on the "executoriness" of contracts in bankruptcy in favor of a more practical, functional approach, which we believe is faithful to the historical purposes that gave birth to the "assume-or-reject" election now codified at 11 U.S.C. § 365, as well as to the present structure of the Bankruptcy Code.

Cohen, former General Counsel, Chief Legal Officer, and Corporate Secretary for Debtor and its wholly-owned subsidiary, Drexel Burnham Lambert, Inc. (DBL),[2] brought this adversary proceeding seeking to compel the estate to pay his claim for $5,232,734.83 as an administrative expense under a March 23, 1989 Employment Agreement. Cohen's claim includes three escrowed bond portfolios with an aggregate value of about $1.5 million, which he purports to own outright.

Cohen timely filed proofs of claim against both Debtor in this proceeding and against DBL in its Chapter 11 case.[3] Cohen's complaint against Debtor seeks: (1) a declaration that Debtor's postpetition termination of his employment entitles him to payment of $5,232,734.83 as an administrative priority claim under 11 U.S.C. § 503(b); (2) a declaration that he is entitled to the immediate turnover of the three escrowed bond portfolios; and, (3) an order requiring Debtor to pay immediately his administrative priority claim in full, under § 503(a). Debtor responded with a motion to reject its contract with Cohen that seeks to strip Cohen of all his interests in the escrowed bonds. Debtor also seeks to limit the amount of Cohen's claim to the cap provided by § 502(b)(7).

Debtor's motion to reject the contract with Cohen will be granted. We will also grant Cohen's motion for summary judgment with respect to the escrowed bond portfolios, but disallow his claim for an administrative expense as to the balance, and hold that it is subject to the damages limitation cap of § 502(b)(7).

## FACTUAL BACKGROUND

Debtor and DBL were the core companies of a number of related business entities that transacted a worldwide business in securities, commodities, and other financial products. After spectacular growth during the 1980s, the Drexel empire was subjected to a series of massive investigations by the SEC arising from allegations of insider trading. The SEC investigations resulted in guilty pleas to felony charges by Debtor and DBL, and in a consent agreement with the SEC, under which final judgment was entered in the SEC's suit for

**1.** Our subject matter jurisdiction over this controversy arises under 28 U.S.C. § 1334(b) and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). This is a core matter under 28 U.S.C. §§ 157(b)(2)(A) and (B). This Memorandum of Decision constitutes findings of fact and conclusions of law under F.R.Civ.P. 52, as made applicable to this proceeding by F.R.Bkrtcy.P. 7052.

**2.** For convenience, we rely on the following conventions: "Debtor" is Drexel Burnham Lambert Group, Inc.; "DBL" is Drexel Burnham Lambert, Inc.; and "Drexel" refers to the business organization of which Debtor and DBL were a part.

**3.** Cohen does not claim administrative expense status as against DBL, because his employment was terminated prior to DBL's May 29, 1990 Chapter 11 filing, which makes his claim against DBL a plain-vanilla, prepetition claim.

injunctive and other relief against the Debtor and DBL. *See, SEC v. Drexel Burnham Lambert, Inc., et al.*, No. 88 Civ. 6209MP, 1989 WL 235956 (S.D.N.Y. June 20, 1989) (U.S.Dist. LEXIS 10383).

The consent agreement and Final Judgment imposed a three-year probationary period on Debtor and DBL, and conditioned their continued operation upon compliance with an extensive set of internal reforms. Paragraph XV(A)(1) of the Final Judgment provided that:

DREXEL shall employ individuals, acceptable to the [SEC], in the positions of (i) general counsel and (ii) director of compliance, who shall report at least every 60 days to the Oversight Committee. The general counsel and the director of compliance shall each have the authority to cancel or revoke securities transactions executed or effected by other DREXEL or (DEBTOR) personnel.

Cohen, who was recommended by the SEC, was employed to fill the position of general counsel. Arms-length negotiation of the employment contract took two months, and resulted in two documents now before us—an Employment Agreement among Cohen, Debtor and DBL, and an Escrow Agreement among Cohen, Debtor, and the Escrow Agent, Rosenman & Colin.[4]

Cohen's employment was to have been for a period of four years, commencing April 17, 1989 (the "Commencement Date"). In the months after Cohen began work, the nature of the Drexel empire changed dramatically. It shrank from a full financial services business serving customers all over the world, to primarily managing its own portfolio of investments. Debtor filed its voluntary petition for relief under Chapter 11 on February 13, 1990. Involuntary petitions were filed against

Drexel Burnham Lambert Trading Corporation on May 9, 1990, and against Drexel Burnham Lambert Trade Finance, Inc. on May 15, 1990. Both involuntary cases were subsequently converted to Chapter 11 cases. DBL and each of 14 of its affiliates filed separate Chapter 11 petitions on May 29, 1990. Drexel Burnham Lambert Government Securities, Inc. filed its Chapter 11 petition on June 20, 1990. Various Official Committees to the Drexel debtors were appointed during the Spring of 1990, and the case was consolidated for procedural purposes by order dated June 20, 1991.[5]

Drexel employed about 10,200 persons prior to 1989. At the time Debtor filed its Chapter 11 petition in February 1990, that number had shrunk to about 5,500 employees. Further dramatic cuts were made after the various petitions were filed, and Drexel now has about 200 employees. The primary focus of the once far-flung financial empire has narrowed to developing a plan of reorganization for the debtors-in-possession.

DBL President Joseph A. Vitanza, who executed the Employment Agreement on behalf of Debtor and DBL, and the Escrow Agreement on behalf of Debtor, advised Cohen on or about April 25, 1990, that Cohen would be terminated as of May 12, 1990, because, with the change in the nature of Drexel's operations, Cohen was no longer needed to perform the functions contemplated by the Employment Agreement. Cohen's employment with Debtor and DBL did in fact terminate as of May 12, 1990, one year and 25 days after he began work, and 83 days after Debtor filed for bankruptcy protection. Cohen's claim is for the unpaid portion of the total compensation due him over the course of the four-year contract.

4. Article 1(A) of the Escrow Agreement makes reference to an additional document, a "Custodian Agreement," among Cohen, the Escrow Agent, and IBJ Schroder Bank & Trust Company, the Custodian, "which shall provide that the Custodian shall act with respect to such bonds only in accordance with written instructions furnished to it by the Escrow Agent in accordance with the terms and conditions of this Escrow Agreement." No copy of that document

was provided to us by the parties, nor have its contents been put in issue before us. Accordingly, we do not consider it in reaching our decision.

5. Drexel Burnham Lambert Realty, Inc. filed a Chapter 11 petition on January 23, 1991, but has not been procedurally consolidated with the other Drexel cases.

The various elements of the compensation package in the Employment Agreement totaled $8 million over the four years. The component parts consisted of:

1. A $1 million bonus payable upon execution and delivery of the Employment Agreement, which was "nonrefundable for any reason whatsoever." Employment Agreement, Article 4(A). This bonus was timely paid, and is not in dispute.

2. A base salary of $250,000 per year, or $1 million total over the four-year contract. Employment Agreement, Article 4(B). Cohen was paid his first year's base salary and a prorated portion of his second year's salary. He seeks payment of the $732,734.83 balance due for the two years and 11 months remaining under the contract.

3. An annual $1 million bonus payable at the conclusion of each year that Cohen worked. Employment Agreement, Article 4(C). Cohen received the first bonus payment on or about April 18, 1990, upon the first anniversary of his employment. He claims that $3 million is still due for the remainder of the contract period.[6]

4. Four stock portfolios purchased by Cohen from Debtor for $100 each, which, when assembled by Debtor, had a value of about $500,000 each at the time of purchase. Employment Agreement 4(D). The bond portfolios had successive maturity dates of June 30, 1990, 1991, 1992 and 1993. Under the Escrow Agreement, the three portfolios, aggregating about $1.5 million in value, are held in escrow by the law firm of Rosenman & Colin.[7] The first portfolio was released to Cohen on or about April 18, 1990, upon the first anniversary of his employment. He seeks an order compelling the escrow agent to release to him forthwith the remaining three portfolios.

Article 6(B) of the Employment Agreement provided that if Debtor or DBL terminated Cohen's employment

---

**6.** Counsel for the parties have carried on a running battle by correspondence to this Court about one aspect of the bonus issue. By letter dated Oct. 21, 1991, more than a month after the Sept. 12, 1991 hearing on this matter, counsel for Cohen argued for the first time that his client should have been paid the second year's $1 million bonus as an administrative expense within 15 days of his termination, under Article 4(C) of the Employment Agreement. Although this theory did not change the total amount claimed as an administrative expense, Cohen simultaneously filed supplemental proofs of claim incorporating this new theory. The Debtor, by letter dated Oct. 30, 1991, argued that Cohen had misconstrued the contract by ignoring the *pro rata* provisions of Article 4(G), was advancing a new argument out of time, and had no right to a $1 million bonus for 25 days' work covering the period from April 17, 1990, the date of his first anniversary, to May 12, 1990. Cohen by letter of Nov. 12, 1991, denied that his theory was a new theory.

We have, grudgingly, reviewed the party's correspondence, and are persuaded that Cohen's new characterization of his entitlement to the second year's bonus does not change our analysis of the parties' rights. We dislike having to review private letters from litigants. Cohen's letters at least contain an "Re:" line identifying the matter to which they relate. Debtor's letters contain neither the case name nor the docket number. The parties did not file the documents with the Clerk, F.R.Bkrtcy.P. 5005(a), nor serve them on other parties, F.R.Bkrtcy.P. 7005, despite the fact that representatives of Official Committees have expressed positions on the issues before us.

The parties' utter default in complying with the requirements for pleadings set forth in F.R.Bkrtcy.P. 7010 and 9004, although apparently customary attorney practice in the Southern District of New York, is unlike the practice in any other district we have had the pleasure to serve. It sometimes seems, as we have several times observed in Court, that there is a Federal Rule of Bankruptcy Procedure in effect only in this district entitled "Litigation by Letter." We are not at all certain that such a pervasive practice, which has been repeatedly criticized and condemned by the other judges in this district, and which contributes to the confusion and overload of an already burdened system, should be overlooked as harmless error. F.R.Bkrtcy.P. 9005. Like the other judges in this district, we will no longer allow this practice. Moreover, we do not understand how the record on appeal could be completed with the litigation by letter approach used here. F.R.Bkrtcy.P. 8006, 8007(c).

**7.** Cohen was a partner in Rosenman & Colin before going to work for Drexel, and rejoined the firm shortly after his employment was terminated.

other than due to Disability or for Cause, then [Cohen] shall be entitled to receive, promptly following the date of such termination, all accrued but unpaid amounts of Base Salary and Annual Bonuses to the date of such termination and [Debtor] shall pay to [Cohen], within fifteen days of the date of such termination, the Special Severance Payment.

The parties agree that Cohen's termination was not for cause, nor due to disability.

The "Special Severance Payment" was defined by Article 6(E) of the Employment Agreement to include both Cohen's rights to the escrowed bond portfolios as set forth in Article 4(D), and

a lump sum payment equal to the sum of the total cash compensation, including Base Salary and Annual Bonuses, which, if [Cohen's] employment had not been terminated, would have been payable to [Cohen] by [Debtor] and DBL during the period commencing with the termination of [Cohen's] employment and ending on the fourth anniversary of the Commencement Date.

The Employment Agreement, Article 4(D)(7), provided that on the Commencement Date, the parties would execute the Escrow Agreement. The four bond portfolios were restricted by Article 4(D)(2) of the Employment Agreement, which provided that Cohen "shall not sell, assign, transfer or otherwise dispose of, and shall not pledge or hypothecate, any or all of the Restricted Bonds." All provisions for removal of the restrictions on the bonds are contained in the Employment Agreement, and not in the Escrow Agreement. Article 4(D)(4) of the Employment Agreement provided that during the course of Cohen's employment, the restrictions on one portfolio would terminate each year, on the anniversary of the Commencement Date, until, at the end of the four-year employment period, restrictions on all four portfolios had been terminated. The Employment Agreement also provided, in substance, that in the event Cohen's employment was terminated by death, disability, or under circumstances entitling him to the Special Severance Payment, then all restrictions on

all bonds in all portfolios would automatically terminate. Article 5(D).

Delivery of the portfolios to Cohen was governed solely by the Escrow Agreement. The Escrow Agent is directed by Article 3 of the Escrow Agreement to successively transfer one of the bond portfolios to Cohen on each anniversary of the Commencement Date while he was employed. Article 6(A) of the Escrow Agreement directed the Escrow Agent, in the event Cohen's employment was terminated by reason of death, disability, or under circumstances entitling him to receive the Special Severance Payment provided under the Employment Agreement, to transfer all remaining portfolios to Cohen, and register them in his name. The Escrow Agent has refused to transfer the bonds to Cohen because of Debtor's representation that to do so would violate the automatic stay provisions of 11 U.S.C. § 362, despite the fact that Article 6(B) authorizes the Escrow Agent to

conclusively rely on a written statement from [Cohen] to the effect that [he] is entitled to transfer and registration of the bonds held by the Escrow Agent ..., notwithstanding the fact that it shall receive written notice from [Debtor] and/or DBL to the contrary or that it shall know or have reasonable grounds to know to the contrary.

One more point needs to be made before we proceed further. The language of the Employment Agreement clearly discloses that it was made with the prospect in full view that the Debtor might subsequently become insolvent or a debtor in bankruptcy. The language used by the parties also evidences a clear intention that, if Cohen's employment was terminated as a result of bankruptcy or insolvency, he would be entitled to the Special Severance Payment. Cohen was to be entitled to that payment even if, in such event, he terminated his own employment. Article 6(C) provides that:

Subsequent to an Act of Bankruptcy, [Cohen] shall have the right to terminate his employment pursuant to this Employment Agreement by written notice to [Debtor] and DBL.

The circumstances defined as an "Act of Bankruptcy" by Article 6(D) include "an assignment for the benefit of creditors," if Debtor and DBL were "generally not paying ... debts as such debts become due," if "any decree or order for relief ... is entered under any bankruptcy," if either entity "commences a voluntary case under a Bankruptcy Law of the United States or any proceedings under a Bankruptcy Law of any other jurisdiction," or if "any such proceedings are commenced against [Debtor] or DBL...." Article 6(B) specifically entitles Cohen to the Special Severance Payment if he exercised his right to terminate employment under Article 6(C).

■ It is now our task to determine the extent to which the parties' prepetition intentions, as expressed in their written agreements, survive postpetition. To prevail on a motion for summary judgment, the movant must satisfy the criteria set forth in F.R.Civ.P. 56 as made applicable by F.R.Bkrtcy.P. 7056. F.R.Civ.P. 56 provides in part:

> [T]he judgment sought shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

See, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Eastman Machine Company, Inc. v. United States*, 841 F.2d 469 (2d Cir. 1988); *Hossman v. Spradlin*, 812 F.2d 1019, 1020 (7th Cir.1987); *Clark v. Union Mutual Life Ins. Co.*, 692 F.2d 1370, 1372 (11th Cir.1982); *United States Steel Corp. v. Darby*, 516 F.2d 961, 963 (5th Cir.1975).

The primary purpose for granting a summary judgment motion is to avoid unnecessary trials where no genuine issue of material fact is in dispute. *Farries v. Stanadyne/Chicago Div.*, 832 F.2d 374, 378 (7th Cir.1987). No facts necessary to the resolution of the parties' cross-motions for summary judgment are in dispute. On cross-motions for summary judgment, the Court must determine whether one of the parties is entitled to judgment as a matter of law based on the undisputed facts. *In re TTS, Inc.*, 125 B.R. 411, 413 (Bkrtcy.D.Del.1991).

## SUMMARY OF PARTIES' POSITIONS

The three-month period of Cohen's postpetition employment is the thin pin on which he hangs his claim to administrative expense status for the three years' compensation still due him under the Employment Agreement. Cohen's initial argument was that by terminating him postpetition, after accepting his services under the Employment Agreement for a period of time, Debtor breached the Employment Agreement postpetition. His postpetition damages, he first said, are a postpetition administrative expense under 11 U.S.C. § 503(b).[8]

Debtor responded to Cohen's complaint in this adversary proceeding by moving, under 11 U.S.C. § 365(a),[9] to reject the Employment Agreement.[10] The motion, dated May 23, 1991, came more than a year after Debtor had terminated Cohen's employment. Simultaneously, Debtor moved for summary judgment, asserting that Cohen's claims are not entitled to administrative expense status as a matter of law, and for partial summary judgment as to the allowed amount of Cohen's claims. Debtor argues for summary judgment in the alter-

8. Section 503, **Allowance of administrative expenses,** provides, in pertinent part:
(b) After notice and a hearing, there shall be allowed administrative expenses ... including—
(1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case....

9. Section 365, **Executory contracts and unexpired leases,** provides, in pertinent part:

(a) {T]he trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

10. The general grant to a debtor-in-possession of "all the rights ... of a trustee serving in a case under this chapter," 11 U.S.C. § 1107(a), authorizes a debtor-in-possession to exercise the trustee's "assume-or-reject" election. For convenience in the discussion that follows, we will use "trustee" to reference both the trustee and the debtor-in-possession.

native. First, Debtor says that by rejecting the Employment Agreement, it converts Cohen's claim for an administrative expense under § 503(b) into a claim for prepetition damages for breach of contract under § 365(g)(1).[11] Rejection of the underlying Employment Agreement, says Debtor, wipes out the Escrow Agreement too, and pulls the plug on whatever rights Cohen had to the escrowed bond portfolios. Second, Debtor says that Cohen's claim can't be an administrative expense under § 503(b)(1), even if we deny its motion to reject. To support this prong of its attack, Debtor argues that: (a) the three years' worth of compensation Cohen seeks is not for the three months' of "services rendered after the commencement of the case," § 503(b)(1)(A), but is a non-priority prepetition obligation; (b) although denominated a "severance payment" by the Employment Agreement, Cohen's claim is in reality a "golden parachute" payment and is thus not among the "actual, necessary costs and expenses of preserving the estate" allowable as an administrative expense under § 503(b)(1)(A); and, (c) the express requirement of § 365(a) for Court approval prior to assumption of a contract means that a contract can't be assumed by conduct. This, Debtor argues, precludes Cohen's claim that Debtor became liable for payments due under the contract by allowing him to work for 83 days before terminating his employment prior to rejecting the contract. Debtor also seeks partial summary judgment, under § 502(b)(7), to limit Cohen's claims to a maximum of one-year's compensation, subject to any defenses and counterclaims by the Debtor.

■ Cohen responded to Debtor's motions with a cross-motion for summary judgment and partial summary judgment, seeking anew exactly what he had asked for in his original complaint. What has changed, however, is Cohen's argument. His response to Debtor's attempt to reject the contract is to deny that termination was in fact a breach. Cohen now says Debtor's termination of Cohen's employment was a matter contemplated by and provided for in the Employment Agreement. Debtor's action relieved him of any further obligation to Debtor, he argues, leaving Debtor's obligation to pay him money as the only performance remaining due under the Employment Agreement. Both parties agree that the contract was executory at the commencement of Debtor's bankruptcy. Cohen's theory, however, is that, more than a year before Debtor's motion to reject, the contract ceased to be an executory contract when his obligations to Debtor ceased. Thus, Cohen argues, Debtor can't reject the Employment Agreement because, under prevailing law, a contract can only be assumed or rejected if it is executory, and a contract is only executory if unperformed obligations remain on both sides. In addition, Cohen argues that even if we allow Debtor to reject the contract, he is still entitled to payment because he is not seeking damages for breach.[12] Rather, he is seeking payment of the Special Severance Payment provided for under the contract in the event of termination without cause, a claim that arose postpetition and pre-rejection immediately upon his termination by Debtor. Cohen also disputes Debtor's contention that his position depends upon Debtor having assumed the contract. His postpetition administrative expense claim arises, he says, because Debtor received postpetition benefits under

---

11. Section 365(g)(1) provides, in pertinent part: {T}he rejection of an executory contract ... of the debtor constitutes a breach of such contract or lease—

(1) if such contract ... has not been assumed under this section or under a plan confirmed under chapter ... 11 ... of this title, immediately before the date of the filing of the petition....

12. Cohen's original argument, that the postpetition breach of a prepetition contract gives rise to an administrative expense priority, is easily dealt with. " 'Where the debtors' obligations stem from contractual liability, even a postpetition breach will be treated as a prepetition liability where the contract was executed prepetition.' " *In re Chateaugay Corp.*, 102 B.R. 335 (Bkrtcy.S.D.N.Y.1989) (quoted in *In re Chateaugay Corp.*, 87 B.R. 779 (S.D.N.Y.1988), aff'd sub nom., *Pension Ben. Guaranty Corp. v. LTV.*, 875 F.2d 1008 (2d Cir.1989), rev'd on other grounds, 496 U.S. 633, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990). See also, *In re THC Fin. Corp.*, 686 F.2d 799 (9th Cir.1982).

the contract. The law of the Second Circuit, Cohen argues, is that when a debtor receives postpetition benefits from a prepetition contract with a severance pay provision, the debtor must pay the severance obligation as an administrative expense. Finally, he now argues that it is not his Employment Agreement that was terminated, but his employment, a fine distinction which he argues saves him from the damages limitation provision of § 502(b)(7).

## PARTIES' LEGAL ARGUMENTS

The psychedelic confusion in the area of executory contracts has infected every aspect of the matter before us, providing textbook examples of the errors in analysis that Westbrook and Andrew complain about. Cohen proffers the view that "executoriness must be found in a contract or it cannot be rejected," resulting here in "a contract neither assumable nor rejectable, leaving it in a legal limbo." Westbrook, *supra*, 74 Minn.L.Rev. at 239. Debtor counters that by virtue of its election to reject, the Employment Agreement "is somehow destroyed or otherwise altered," Andrew, *supra*, 62 U.Colo.L.Rev. at 17, n. 71; Andrew, *Executory Contracts in Bankruptcy: Understanding 'Rejection'*, 59 U.Colo.L.R. 845, 884 (1988), and its obligations thereunder are "rejected right out of existence." Westbrook, *supra*, 74 Minn. L.Rev. at 239. The "aggravated derivative" of Debtor's theory is that "rejection of a contract somehow destroys a right in or to property created by the contract," Andrew, *supra*, 62 U.Colo.L.Rev. at 17, n. 71; Andrew, *supra*, 59 U.Colo.L.R. at 884, in this case Cohen's property interests in the escrowed bonds "created prepetition by state law," without regard to whether "they are not avoidable under the statutory avoiding power." Westbrook, *supra*, 74 Minn.L.Rev. at 239. Even Cohen's claim that severance payments are entitled to administrative expense status hinges on the legal effect of an executory contract prior to either acceptance or rejection.

The parties have each offered us attractive, colorful and coherent patterns, some more fanciful than others, to impose upon the facts before us. Each of the two conflicting, variegated visions of the law is composed of bits and pieces snipped from the welter of cases which have focused on the "executoriness" *vel non* of the particular executory contract at issue as the key to deciding whether it can be assumed or rejected under § 365(a). We are hardpressed to choose between them, based on the traditional analyses Courts have applied in the area of executory contracts. Our review of a large sample of the larger body of precedent persuades us that Prof. Westbrook is correct in arguing that "the threshold requirement of 'executoriness' is not merely unnecessary, but leads to error." While

> the executoriness requirement can almost always be manipulated to produce the correct result, ... the fact that it deflects the courts from the true problems of state contract law invites—and often produces—error.

Westbrook, *supra*, 74 Minn.L.Rev. at 287. After grappling with the issues presented by the parties, we believe that we could, using existing "executoriness" precedent, plausibly justify any number of results, from affording either party the complete relief it seeks, to deciding the case as we actually do. While "executoriness" analysis can provide a reason for any result we might reach, we find it useless as a tool for reaching a reasoned result. Accordingly, we proceed by outlining the parties' arguments, describing the history and limitations of "executoriness," and then decide the matter on what we believe to be the appropriate bankruptcy principles.

Cohen's argument that his contract cannot be rejected begins with the language of § 365, which provides that "the trustee, subject to the court's approval, may assume or reject any *executory* contract." (Emphasis added). Out of that word—"executory"—has grown the "executoriness" limitation on the trustee's ability to assume or reject that Cohen would have us apply.

> The executoriness requirement has been poured into the word 'executory' by a century of caselaw.

Westbrook, *supra*, 74 Minn.L.Rev. at 243. The current, generally accepted test for

executoriness is the material breach test articulated by Harvard Law School Professor Vern Countryman. Under that test, an executory contract for purposes of § 365 is:

> a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other.

Countryman, *Executory Contracts in Bankruptcy* (pt. 1), 57 Minn.L.Rev. 439, 460 (1973). That test has been widely adopted. See, e.g., *In re Terrell*, 892 F.2d 469, 471 (6th Cir.1989); *In re Streets & Beard Farm Partnership*, 882 F.2d 233, 235 (7th Cir.1989); *Sharon Steel Corp. v. National Fuel Gas Distribution Corp.*, 872 F.2d 36, 39 (3rd Cir.1989) ("courts have generally relied on" the Countryman definition); *Draper v. Draper*, 790 F.2d 52, 54 (8th Cir.1986); *Gloria Manufacturing Corp. v. International Ladies' Garment Workers' Union*, 734 F.2d 1020, 1021 (4th Cir.1984) (Countryman definition "uniformly followed by courts").

Cohen argues that Debtor cannot reject the Employment Agreement because, at the time the Debtor moved to reject, Cohen no longer owed any further performance. The three cases he cites say what he says they do. They also illustrate the confusion and perverse results that flow from making executoriness a prerequisite to rejection.

*In re Leibinger–Roberts, Inc.*, 105 B.R. 208 (Bkrtcy.E.D.N.Y.1989), involved a motion by a 49% shareholder for an order forcing the debtor to either assume or reject a shareholders' agreement among the movant, the 51% shareholder, and the debtor. *Id.*, at 209–10. The Court concluded that the agreement was no longer executory, because no material obligations were owing by the movant to the debtor, and

because neither assumption nor rejection would have had any benefit for the estate.[13] *Id.* at 213. The Court's characterization of the remaining obligations as *de minimis* and not material, however, is not persuasive. The shareholders agreement provided that movant would be president and chief executive officer of the company, would have the right to name one of three directors, and, upon termination of the movant's association with the company, the debtor would repurchase his stock. *Id.*, at 209–10. Postpetition, movant's employment agreement was

> assumed by the debtor, presumably so as not to trigger the termination clause in the shareholder's agreement, which would obligate the debtor to redeem Fulton's shares.

*Id.*, at 210. We find it incomprehensible that an agreement with these continuing obligations could be characterized as not executory under the Countryman test.

The case also illustrates a weakness in the test itself. Among the obligations held to be non-executory was the right of first refusal of the other shareholder and the debtor to purchase the movant's stock. *Id.*, at 213. Professor Andrew's analysis of the result dictated by the Countryman test in situations involving option contracts is apt here as well:

> The debtor's purchase of the property is completely optional, and thus it cannot be said that "the failure of either [party] to complete performance would constitute a material breach excusing the performance of the other." As a result, the contract cannot be assumed. But there is no justification whatsoever for that result. It is nothing more than a spurious artifact of Countryman's use of "breach" terminology as a conceptual intermediary.

Andrew, *supra*, 59 U.Colo.L.R. at 32–33.[14] Indeed, the Court in *Leibinger–Roberts*

---

13. It appears nothing turned on the motion in any event, because general creditors were to receive a 100% dividend with interest.

14. See, *In re Continental Properties, Inc.*, 15 B.R. 732, 736 (Bkrtcy.D.Haw.1981) ("An option is an executed contract, not an executory contract.").

But see, *In re G–N Partners*, 48 B.R. 462, 465–66 (Bkrtcy.D.Minn.1985) (option held to be executory contract when analyzed "in light of the purposes of § 365: to allow a trustee to pick and choose among the debtor's agreements and assume those which benefit the estate and reject those which do not").

was clearly manipulating the material breach test to obtain a result. While it found that the contract was no longer executory, *Leibinger–Roberts*, supra, 105 B.R. at 211, it expressly made its decision "without prejudice to renewal at a future date if and when there is a change in conditions." *Id.*, at 214. Although an executoriness analysis was used, the Court's curious holding, that a contract that was not then executory might become so in the future, was really based on the instrumental purpose underlying the Countryman test. The Court, in fact, said as much.

> When a debtor cannot reap any present or future benefits from a contract due to a change in circumstance, the contract's life as an executory contract comes to an end and the contract becomes unilateral and enforceable against the parties in the absence of a valid defense.

*Id.*, at 211. The absence of any benefit to the debtor would justify non-assumption, even absent executoriness, and is in any case no reason to deny to a creditor the right to certainty which § 365(d)(2) [15] was enacted to provide.[16] Thus, *Leibinger–Roberts*, which is probably wrong even under the Countryman test, illustrates both the confusion and the perversity that result when executoriness analysis is used instead of looking to the real issue—what benefits the estate.

*In re Chateaugay Corp.*, 102 B.R. 335 (Bkrtcy.S.D.N.Y.1989), was a fact-specific case involving the debtor's objections to a creditor's claim for administrative expenses for the possible postpetition loss of tax benefits the creditor had purchased from the debtor prepetition, under short-lived provisions of the Economic Recovery Tax Act of 1981, Pub.L. 97–34, 95 Stat. 172 (1982). *Id.*, at 339. The debtor framed the issues in that case by asking the Court to hold that the underlying "Tax Benefit Transfer Agreements" were not executory contracts and, thus, not subject to the assume-or-reject election of § 365. *Id.* This appears to have been an intermediate step toward the debtor's ultimate goal of having the creditor's claims allowed as prepetition general unsecured claims. Our review of the opinion persuades us that its focus on "executoriness" adds nothing to the case, and does not affect the outcome. Here, as in *Leibinger–Roberts*, characterization of the remaining obligations as non-material are problematic.[17] *Id.*, at 346–48. Even had executoriness been found, rejection by the debtor would have achieved the debtor's objective. Moreover, the whole discussion of § 365 is rendered unnecessary by the Court's alternative holding that the creditor's claim was not entitled to administrative expense priority under § 503(b)(1)(A), because the underlying contracts were prepetition agreements from which the debtor received no postpetition benefit.[18] *Id.*, at 352–356.

**15.** Section 365(d)(2) provides, in pertinent part: {T}he court, on the request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease.

**16.** "This provision will prevent parties in contractual or lease relationships with the debtor from being left in doubt concerning their status *vis-a-vis* the estate." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 348 (1977), reprinted in App. 2 *Collier on Bankruptcy*, II. H.R.Rep. 595 at 367 (15th ed. 1991).

**17.** For example, the Court "held that the parties' off-setting monetary obligations ... merely represent obligations for the payment of money only and are therefore insufficient" to make the agreements executory. *Id.*, at 347. Every one of the five authorities cited for this proposition involved, not reciprocal obligations to pay money, but a situation in which the only remaining obligation was of one party to pay money to the other. H.R.Rep. No. 595, 95th Cong., 1st Sess. 347 (1977), U.S.Code Cong. & Admin.News 1978, 5787, 5963, 6303–6304; *In re Newcomb*, 744 F.2d 621, 624 (8th Cir.1984); *In re Grayson–Robinson Stores, Inc.*, 321 F.2d 500, 502 (2d Cir.1963); *In re THC Financial Corp.*, 686 F.2d 799, 804 (9th Cir.1982); *In re Unishops, Inc.*, 422 F.Supp. 75, 78–80 (S.D.N.Y.1975).

**18.** The Court, *Id.* at 353, n. 14, dismissed the creditor's reliance on *In re Unishops, Inc.*, 553 F.2d 305, 308 (2d Cir.1977), a Bankruptcy Act case that held:

> It is settled law that a claim arising under an executory contract is entitled to priority "if the trustee or debtor in possession elects to assume the contract or if he receives benefits under it." (Citations omitted).

The Court said the *Unishops* test was not controlling in the case *sub judice,* because it had previously determined that there was no exec-

The collective bargaining agreement[19] at issue in *Gloria Manufacturing Corp. v. International Ladies' Garment Workers' Union*, 734 F.2d 1020, 1021 (4th Cir.1984), expired postpetition by its own terms, between the filing of the debtors' motion to reject and the hearing on the motion. *Id.* The debtor apparently viewed rejection as a way of ensuring that its unmet obligations under the contract were not allowed as administrative expense claims. *Id.*, at 1021, n. 2. The Fourth Circuit Court of Appeals affirmed opinions of the Bankruptcy Court and District Court granting the union's motion for summary judgment and dismissing the case on grounds of mootness. *Id.*, at 1022. The Fourth Circuit's decision did not decide what priority prepetition and postpetition wage and benefit claims would receive. Nor should rejection, even had it been allowed, have shaped the claims allowance issues under §§ 502 and 503. Moreover, the commonsense holding that an expired contract can't be rejected does not need to rest upon the Countryman test. Indeed, the Court in *In re G–N Partners*, 48 B.R. 462, 465–66 (Bkrtcy.D.Minn.1985) first refused to find that the absence of executoriness under the Countryman test precluded the debtor's assumption of a land contract, and then held that "[n]othing in Section 365 makes a contract executory after it expires by its own terms." Finally, *Gloria* is not authority for the proposition that a debtor can't terminate an employee's employment and then reject the unexpired contract.

In summary, the cases relied on by Cohen for the proposition that "executoriness" must be found as a precondition to rejection raise more questions than they answer. Our readings persuade us that in each case, use of the Countryman test was neither necessary nor determinative. It was, rather, merely window dressing for results determined in the first instance by resort to another, sometimes unspecified criterion. In *Leibinger–Roberts*, that criterion was clearly stated—benefit to the estate. *Id.*, 105 B.R. at 211.

The Debtor responded to Cohen's cases with a cacophony of its own, which stand for the proposition that "the critical time for determining whether an unexpired contract is executory is when the petition is filed—not later when the motion to reject is made." Debtor's Reply in Further Support of Motion to Reject the Employment Agreement By and Among the Drexel Burnham Lambert Group, Inc., Drexel Burnham Lambert, Incorporated and Cohen pursuant to Section 365(a) of the Bankruptcy Code, at 11. Debtor's cases were *In re Coast Trading Co.*, 744 F.2d 686, 692 (9th Cir.1984) ("contract was not executory at the time [debtor] filed for bankruptcy"); *In re Newcomb*, 744 F.2d 621, 624 (8th Cir.1984) (" 'executory contract' that can be rejected in bankruptcy is a contract on which performance remains due on both sides at the time of the bankruptcy petition"); *In re Bastian Co.*, 45 B.R. 717, 721–22 (Bkrtcy.W.D.N.Y.1985) ("the appropriate time for determining whether a contract is executory and, therefore, rejectable is as of the date of filing the petition in bankruptcy"); *In re MCorp. Financial, Inc.*, 122 B.R. 49, 50 (Bkrtcy.S.D.Tex.1990) ("The point in time for determining whether a contract is executory is the date the bankruptcy petition is filed."); *In re Ridgewood Sacramento, Inc.*, 20 B.R. 443, 445 (Bkrtcy.E.D.Cal.1982) ("contract remained executory on the date that the debtor filed its voluntary petition"); *In re Rovine Corp.*, 6 B.R. 661, 665 (Bkrtcy.W.D.Tenn.1980) ("obligations remained to be performed by the defendant at the time of filing"). Each of those cases, however, involved the status of the contract at issue

utory contract. Even assuming that *Unishops* remains good law, and we do not for reasons set out hereinafter, that determination was not necessary to the opinion because the Court subsequently determined that the debtor had in fact received no benefit.

**19.** The matters at issue in *Gloria* are now governed by special Code provisions subsequently enacted, §§ 1113, 1114. Section 1113 was adopted in the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, title III, § 541(a), 98 Stat. 333, 390 (1984). Section 1114 was enacted in the Retiree Benefits Bankruptcy Protection Act of 1988, Pub.L. No. 100–334, § 2, 102 Stat. 610 (1988).

at the time of filing; none turned on whether a contract executory at the time of filing could subsequently cease to be so. Accordingly, they do not constitute an authoritative basis for disputing Cohen's next point.

█ Cohen maintains that the critical date for determining executoriness is the date on which the motion to reject was filed, not the date the Chapter 11 petition was filed. In support of this proposition, he cites *Gloria, supra*, 734 F.2d at 1022; *In re Pesce Baking Co., Inc.*, 43 B.R. 949, 957 (Bkrtcy.N.D.Ohio 1984); and *In re Government Securities Corp.*, 101 B.R. 343, 349 (Bkrtcy.S.D.Fla.1989). Although it is a minor point, none of the three hold that the critical date is the date of the motion to reject. Rather, each holds that executoriness had to exist at the time of the Court's hearing. The first two involved collective bargaining agreements that expired postpetition but prior to hearing.

The third case, *In re Government Securities*, a liquidation case, involved § 365(d)(1), which provides that an executory contract not assumed within 60 days is deemed rejected. The Court noted that "{a}lthough a contract may be executory on the date the bankruptcy petition is filed, circumstances may arise which render the contract no longer executory." *Id.,* at 349. The only such circumstance cited, however, is the expiration of a contract by its own terms. *Id.* The contract at issue there contained a provision that said coverage provided by a bond would be terminated or cancelled as to any employee as soon as the insured learned of dishonest or fraudulent conduct by the employee. The bond issuer argued that the contract was executory, the trustee had failed to timely assume it, and therefore it was not liable for the damages caused by dishonest employees. *Id.,* at 350. The Court did reject that argument, and held that it was not an executory contract and thus was not subject to the assume-or-reject election. More to the

point, however, is that the Court refused to hold the contract executory because to do so would defeat the purpose of the assume-or-reject election.

> In asserting that the contract was executory, [the creditor] is attempting to utilize to its advantage a statute designed to inure to the benefit of the bankrupt or the bankruptcy estate. In effect, [the creditor] is asking the Court to use the trustee's avoidance power [20] against the trustee. Such a result in this context is not contemplated by the Bankruptcy Code.

*Id.* at 349. Thus, executoriness was, once again, window dressing for a decision premised in the first instance on the benefit-to-the estate criterion. While an executoriness analysis is utterly useless in deciding whether Cohen's claim is akin to those involved in these three cases, this criterion does supply an answer that makes sense. We concur with the holding in the *Government Securities* case, and believe that the criterion actually used forms the proper basis for applying § 365 to deny Cohen's administrative expense claim.

## HISTORICAL BACKGROUND OF "EXECUTORINESS"

█ A contract, by definition, bestows on those party to it certain rights in exchange for which they take on certain obligations. See, e.g., 17A *Am.Jur.2d,* Contracts, § 18 (1991); 17 *CJS*, Contracts, § 1(2) (1963). The rights of one party under the contract are, generally, the obligations of the other. Westbrook, *supra,* 74 Minn.L.Rev. at 231. A debtor's positions on both sides of its contracts follow it into bankruptcy, although by different routes. A debtor's unperformed obligations pour into the bankruptcy proceeding in the form of proofs of claims filed by the creditors to whom they are owed, under § 501, which are then allowed under § 502.

Exactly how and when executory contracts come into the estate has been the

---

**20.** The Court's use of the phrase "avoidance power" is unfortunate. All that is avoided in rejection of an executory contract is the debtor's obligation to perform it. As we later hold, rejection is in no sense an avoidance power akin to those found in §§ 544 and 545. Andrew, *supra,* 62 U.Colo.L.Rev. at 10, 17; Westbrook, *supra,* 74 Minn.L.Rev. at 239.

source of continuing controversy and progressive development. One view, the exclusionary analysis, holds that executory contracts remain outside the estate prior to assumption. The competing view holds that they enter the estate initially, but are thereafter subject to abandonment via rejection. The Ninth Circuit's holding in a case under the Bankruptcy Act is characteristic of how the exclusionary analysis operates:

> Because executory contracts and leases involve future liabilities as well as rights ... an affirmative act of assumption by the trustee is required to bring the property into the estate in order to ensure that the estate is not charged with the liabilities except upon due deliberation. Thus, executory contracts and leases—unlike all other assets—do not vest in the trustee as of the date of the filing of the bankruptcy petition. They vest only upon the trustee's timely and affirmative act of assumption.

*In re Lovitt*, 757 F.2d 1035, 1041 (9th Cir. 1985). (Citations omitted).

Professor Andrew, who supports the exclusionary analysis, points out that "{t}he assume-or-reject election was originally a judicial creation, not a statutory one." Andrew, *supra*, 62 U.Colo.L.Rev. at 19. An early 19th century English case, *Copeland v. Stephens*, 106 Eng.Rep. 218 (KB 1818), is, he says, the "fountainhead of U.S. executory contracts doctrine." Andrew, *supra*, 59 U.Colo.L.R. at 856. The debtor in that case argued that his bankruptcy assignees were responsible for the rent on his lease of real property by virtue of a general assignment of all of his property to them. *Id.* That case, which gave the assignees "{t}he right to *accept* or *refuse*" the lease, Andrew, *supra*, 59 U.Colo.L.R. at 857 (quoting *Copeland, supra*, 106 Eng.Rep. at 222) (emphasis supplied by Andrew), held that pending the assignees' decision, the lease belonged to the debtor." *Copeland* "was imported into the U.S. largely intact, and was applied to both leases and other contracts." Andrew, *supra*, 59 U.Colo. L.R. at 858. "{I}n the face of statutes that, like today's Bankruptcy Code, did not in any way expressly exclude contracts or

leases from the estate," he says, "the courts were quite explicit that what was being 'rejected' by the bankruptcy trustee was *title* to the contract or lease asset." Andrew, *supra*, 62 U.Colo.L.Rev. at 19–20 (emphasis added). Moreover, Andrew persuasively argues that the exclusionary theory was codified in the Bankruptcy Act in 1938. When the Code was enacted in 1978, it adopted the basic language of the Act in this area, without any indication in the legislative history that Congress intended to change the underlying exclusionary doctrine. *Id.*, at 20. See also, Andrew, *supra*, 59 U.Colo.L.R. 861–62, nn. 94–95.

The exclusionary view, counters Professor Westbrook, who holds to the contrary theory,

> has no foundation in the Code. Worse still, it forces us to evade and distort the whole structure of section 541, creating manifold possibilities for confusion and error.

Westbrook, *supra*, 74 Minn.L.Rev. at 325. Section 541 provides:

> (a) The commencement of a case ... creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:
>
> > (1) ... all legal or equitable interests of the debtor in property as of the commencement of the case.

"The House and Senate Reports on the Bankruptcy Code indicate that § 541(a)(1)'s scope is broad," *U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 204–05, 103 S.Ct. 2309, 2313–14, 76 L.Ed.2d 515 (1983), gathering into the estate "all kinds of property, including tangible or intangible property." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 367 (1977), reprinted in App. 2 *Collier on Bankruptcy*, II. H.R.Rep. 595 at 367 (15th ed. 1991). "Contractual rights are intangible property which is included within the definition of the estate of the debtor." *In re Chateauguay Corp.*, 116 B.R. 887, 898 (Bkrtcy.S.D.N.Y.1990).

The Ninth Circuit, this time in a case under the Code, *In re Computer Communications, Inc.*, 824 F.2d 725 (9th Cir.1987), explicitly rejected the exclusionary analysis

when confronted with one possibility for confusion and error. The creditor had unilaterally terminated a contract with the debtor under a bankruptcy default clause contained in the contract. *Id.,* at 726. The creditor argued that because executory contracts are not property of the estate, the automatic stay provisions of § 362, which protect property of the estate, did not bar termination. The Court rejected the creditor's argument, holding that § 541(c)[21] "plainly stated that a contract comes within the definition of 'property of the estate' despite non-assignability or the existence of a bankruptcy default clause." *In re Computer Communications, Inc., supra,* 824 F.2d at 730.

While Andrew appears to be correct in arguing that at no specific time in the history of bankruptcy law did Congress expressly mandate abandonment of the exclusionary theory, Westbrook appears to have the tide of legal thinking on his side. As even Andrew concedes, "the resolution of important contract liability issues through intermediating 'title' concepts seems increasingly antiquated,"[22] Andrew, *supra,* 59 U.Colo.L.R. at 865, and "[t]he historical relationship between the assume-or-reject election and the vesting of the estate's title to a contract or lease is rapidly becoming forgotten." *Id.,* at 864. This trend is illustrated by the Ninth Circuit, which relied on the exclusionary analysis under the Act in Lovitt, but disavowed it under the Code in *In re Computer Communications.* Moreover, whatever its historical antecedents, the plain language of § 541 sweeps in every kind of prepetition interest of the debtor in property not expressly excepted. Nothing in the Code suggests that some kinds of interests lurk in limbo outside the estate until assumed. Indeed, as the Ninth Circuit points out, § 541(c) seems to be an explicit confirmation that executory contracts are in fact a part of the estate.

The Supreme Court has defined the parameters within which we must operate when construing a statute that is clear and unambiguous on its face:

"The task of resolving [a] dispute over ... meaning begins where all such inquiries must begin: with the language of the statute itself. In this case it is also where the inquiry should end, for where, as here, the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'"

*U.S. v. Ron Pair Enterprises,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290, 298 (1989), quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442, 452 (1917).

Accordingly, we hold that executory contracts are property of the estate within the meaning of § 541. While this holding avoids confusion in such areas as the scope of the automatic stay, it in no way alters or compromises

the very simple, uncontroversial principle that the exclusionary doctrine was created, instrumentally, to enforce: that a bankruptcy estate does not, absent its express election, incur administrative liability on a contract of the debtor.

---

**21.** Section 541(c) provides, in pertinent part:
(1) {A}n interest of the debtor in property becomes property of the estate ... notwithstanding any provision in an agreement, transfer instrument or applicable nonbankruptcy law—
(A) that restricts or conditions transfer of such interest by the debtor; or
(B) that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title, or on the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement, and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

**22.** Andrew cites as examples of the increasing irrelevance of "title" U.C.C. § 2–401, which makes virtually all provisions of Article 2 applicable "irrespective of title to the goods," and U.C.C. § 9–202 which makes Article 9's provisions applicable "whether title to collateral is in the secured party or in the debtor." Another example he could have given is the omission of the concept of title from the Code. Section 70a vested the trustee "by operation of law with the title of the bankrupt as of the date of the filing" in the bankrupt's property. By contrast, § 541(a) of the Code "creates an estate" that is "comprised" of "all legal or equitable interests of the debtor in property as of the commencement of the case."

Andrew, *supra*, 62 U.Colo.L.Rev. at 21–22. That principle, combined with the express statutory mandate that the debtor's election is "subject to the court's approval," § 365(a), is the reason we reject Cohen's argument that the Employment Agreement cannot be rejected. We will not blindly apply a rule, disregarding its reason for being, to achieve a result it was created to avoid.

■ Although exclusionary analysis is no longer good law, by acknowledging it as the historical foundation for the assume-or-reject election,

> we can understand that the term 'rejection,' a product of the exclusionary doctrine does not embody the contract-vaporizing properties so commonly ascribed to it.

Andrew, *supra*, 62 U.Colo.L.Rev. at 22. Rejection merely frees the estate from the obligation to perform; it does not make the contract disappear. Accordingly, we also reject the Debtor's argument that it can reject the ground out from under Cohen's interest in the escrowed bond portfolios.

Both arguments illustrate how often the "very simple, uncontroversial principle" that gave rise to the assume-or-reject election in the first place has been lost in the last century of jousting between creditors and trustees over whether the obligations of particular contracts can be declined. The "chronic uncertainty and constant litigation" that characterize the present state of the law of executory contracts, Andrew, *supra*, 59 U.Colo.L.R. at 932, result directly from a focus on "executoriness" as a precondition to the election. Ironically, the present test for determining whether a contract can be assumed or rejected, the "Countryman test," was itself an attempt

to cut through the confusion and return to the basics.

Professor Countryman, in two landmark Minnesota Law Review articles in the early 1970s,[23] developed a test for the existence of executory contracts that, at the time, "was a godsend to judges perplexed by the strange results they found in bankruptcy contract cases." Westbrook, *supra*, 74 Minn.L.Rev. at 237. Countryman began where his inquiry should perhaps have ended, by noting:

> The concept of the "executory contract" in bankruptcy should be defined in the light of the purpose for which the trustee is given the option to assume or reject. Similar to his general power to abandon or accept other property, this is an option to be exercised when it will benefit the estate. *A fortiori*, it should not extend to situations where the only effect of its exercise would be to prejudice other creditors of the estate.

Countryman, *supra*, 57 Minn.L.Rev. at 450.[24]

He built on that foundation "by a process similar to one method of sculpting an elephant"—"Obtain a large piece of stone. Take hammer and chisel and knock off everything that doesn't look like an elephant." Countryman, *supra*, 57 Minn. L.Rev. at 460. Countryman's sculpting broke off two primary categories of contracts from the stone with which he started. First, he chipped away

> the contract under which the nonbankrupt party has fully rendered the performance to which the bankrupt is entitled, but which the bankrupt has performed only partially or not at all.

---

**23.** The two articles are: Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn.L.Rev. 439 (1973), and Countryman, *Executory Contracts in Bankruptcy: Part II*, 58 Minn.L.Rev. 479 (1974).

**24.** Some Courts have, as we do, both adopted Countryman's suggestion that the purpose of the assume-or-reject election should be determinative, and elected not to use his material breach test as the means to achieve that purpose. See, e.g., *In re Government Securities Corp.*, supra, 101 B.R. at 348, n. 2, and 348–49 ("In applying

the functional approach, it is necessary to work backward, proceeding from an examination of the goals rejection is expected to accomplish."); *In re G–N Partners*, supra, 48 B.R. at 465–66 (contract held executory based on an analysis of whether it would "add to or detract from the estate's benefit or liabilities"); *In re Jolly*, 574 F.2d 349, 351 (1978) (proper approach "to deciphering the meaning of the executory contract rejection provisions, is to work backward, proceeding from an examination of the purposes rejection is expected to accomplish").

Countryman, *supra*, 57 Minn.L.Rev. at 451. Such contracts should be excluded from the trustee's assume-or-reject election, he argued, because

> [t]he estate has whatever benefit it can obtain from the other party's performance and the trustee's rejection would neither add to nor detract from the creditor's claim or the estate's liability. His assumption, on the other hand, would in no way benefit the estate and would only have the effect of converting the claim into a first priority expense of administration and thus of preferring it over all claims not assumed....

Countryman, *supra*, 57 Minn.L.Rev. at 451–52. It is important to note that under Countryman's analysis, no harm is done by rejecting a contract that the non-debtor party has fully performed. Rejection is merely a nonconsequential superfluity. The harm arises when such a contract is assumed. Cohen's argument against rejection of the Employment Agreement turns Countryman's policy goals inside out. Because Cohen has fully performed, he argues, the contract can't be rejected, which has the result of forcing the Debtor to accord it administrative expense status. Thus, Cohen would have us mechanically apply a rule against doing what is harmless to achieve what is harmful.

Countryman's second whack at the rock knocked off contracts "which the bankrupt has fully performed, but which the non-bankrupt party has performed only partially or not at all." Countryman, *supra*, 57 Minn.L.Rev. at 458.

> Obviously, the trustee's assumption of the underlying contract would add nothing to his title to the claim. And it would make no sense to say, as § 63c [25] (of the Bankruptcy Act) does of executory con-

tracts, that the trustee's rejection of a contract fully performed by the bankrupt "shall constitute a breach of such contract." Nor could the other contracting party, who has received full performance from the debtor, have much of a claim (for the breach).

> Since the bankrupt's claim against the other party is an asset which will pass to the trustee, it is one which the trustee can accept or abandon just as he can accept or abandon noncontractual claims. But his acceptance of the asset merely leaves the other party's liability where § 70a [26] of the Act has already transferred it, while his abandonment of it merely leaves the other party liable to the bankrupt as he was before bankruptcy.

Countryman, *supra*, 57 Minn.L.Rev. at 459. (Parentheticals added for clarity).

The elephant Countryman sees remaining after knocking off those two pieces is:

> a contract under which the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other.

Countryman, *supra*, 57 Minn.L.Rev. at 460. This definition "has become the standard test for an executory contract" in bankruptcy. Westbrook, *supra*, 74 Minn.L.Rev. at 236.

The material breach test is Countryman's effort to ensure that the trustee's right to assume or reject is indeed "an option to be exercised when it will benefit the estate," and which does "not extend to situations where the only effect of its exercise would be to prejudice other creditors of the estate." Countryman, *supra*, 57 Minn.L.Rev. at 450–51. He explains how the material breach test for an executory contract

---

**25.** Section 63, **Debts Which May Be Proved,** provided, in pertinent part:

> c. Notwithstanding any State law to the contrary, the rejection of an executory contract or unexpired lease, as provided in this Act, shall constitute a breach of such contract or lease as of the date of the filing of the petition initiating a proceeding under this Act.

**26.** Section 70 of the Act, **Title to Property,** provided, in pertinent part:

> a. The trustee of the estate of a bankrupt ... shall ... be vested by operation of law with the title of the bankrupt as of the date of the filing of the petition initiating a proceeding under this Act ... to all of the following kinds of property wherever located ... (5) property, including rights of action, which prior to the filing of the petition he could by any means have transferred....

serves these purposes by comparing the results it achieves when a debtor has both claims and obligations under a contract with the results obtained under the two classes of contracts excluded in his sculpting process.

> Such a contract, similar to the contract under which the party has fully performed but the bankrupt has not, represents a claim against the estate. But here that claim may be reduced or totally eliminated if the trustee rejects the contract because the other party is required to mitigate damages by an amount approximating the value of the performance he is spared by the trustee's rejection.

Countryman, *supra*, 57 Minn.L.Rev. at 461.

On the other side of the equation, a contract meeting Countryman's material breach test,

> like the one under which the bankrupt has fully performed but the other party has not, represents an asset of the estate to the extent that it carries the unperformed obligation of the other party. But if the trustee elects to assume the contract, as when he accepts other assets to which he takes the title of the bankrupt ..., he takes it *cum onere* and must render that performance which the bankrupt had contracted to perform as a condition to receiving the benefits of the contract.

*Id.*

Determining in a given case whether to assume or reject is a function of the trustee's

> routine duties ... to maximize the value of property the estate has inherited from the pre-petition debtor and to minimize the pre-petition claims against the estate.

Westbrook, *supra*, 74 Minn.L.Rev. at 244. This obligation is undertaken on behalf of creditors who are not themselves parties to the contracts at issue. *Id.*

Where the debtor is owed but does not owe, or owes but is not owed, the analysis is conceptually simple. In the former case, if the cost of collection is less than the value of the performance owed, the debtor enforces its rights. In the latter case, the claim, if allowed, shares in any distributions. Contracts, however,

> are unique because they consist of both property and claims, the debtor's rights under a contract and the debtor's obligations. Furthermore, the rights and obligations are often interdependent, with enjoyment of a particular right dependent upon performance of a particular obligation. As a result, the trustee's determination of the most profitable course for the estate is much more complicated than for other types of property and claims.

Westbrook, *supra*, 74 Minn.L.Rev. at 244.

The primary complicating factor, as Professor Westbrook points out, is the impact of the fundamental bankruptcy principle of equality of distribution.

> From the equality principle comes the rule of *pro rata* distribution to pre-petition unsecured creditors. The *pro rata* rule requires that unsecured creditors share proportionately in distributions, with the result that almost never are they paid in full. Their claims are calculated in full under state law ..., but their actual relief, the payment of the claims, can be thought of as being in little tiny Bankruptcy Dollars, which may be worth only ten cents in U.S. dollars. In sharp contrast, if the trustee assumes a contract, then it is converted into an estate obligation, a post-petition obligation, and the Other Party becomes entitled to full performance or payment as an administrative claim. Because administration claims are paid first in any distribution, they are usually paid in full, 100–cent U.S. dollars.

Westbrook, *supra*, 74 Minn.L.Rev. at 252–53.

Where the debtor both owes and is owed, § 365(a) provides, with exceptions not relevant here, that "the trustee, subject to the court's approval, may assume or reject any executory contract." Characterization of the election to reject is another point of dispute between Andrew and Westbrook, one which follows from their disagreement over whether executory contracts are initially inside or outside the estate. Andrew

argues that the contract remains outside the estate, still owned by the debtor, but subject to the estate's assume-or-reject election. If the estate assumes, then the contract comes in. Arguing again from the historical evolution of the concept, Andrew characterizes the " 'breach' consequence of rejection [as] a claims-allowance rule," Andrew, *supra*, 62 U.Colo.L.Rev. at 23, developed by the Courts to surmount the problems created prior to and under the Bankruptcy Act, when claims had to be "provable"[27] to share in estate distributions. Andrew traces the genesis of the rule to the Supreme Court's holding in *Central Trust Co. v. Chicago Auditorium Association*, 240 U.S. 581, 36 S.Ct. 412, 60 L.Ed. 811 (1916), which

> solved the uncertainty problem by creating a legal presumption of a breach by the debtor as of the moment of bankruptcy in cases where the contract was not assumed.

Andrew, *supra*, 62 U.Colo.L.Rev. at 7. The principle was codified in the 1938 Chandler Act amendments to the Bankruptcy Act of 1898, Act of June 22, 1938, ch. 575, 52 Stat. 840, by modifying § 63c to provide that rejection would constitute a breach. Based on this historical understanding, Andrew argues that rejection is not itself a breach, but the non-debtor party, for reasons of fairness, is allowed to share in estate distributions "as if" there had been a breach immediately before the petition was filed, § 365(g). Andrew, *supra*, 62 U.Colo.L.Rev. at 25.

> The breach concept was invented to insure that the non-debtor party could assert a claim on a non-assumed contract by rendering irrelevant the absence of an actual breach by the debtor at the time of bankruptcy. The estate needs no power to breach, because it is not obligated (i.e., administratively) on the contract without assumption in any event. The

breach here is a deemed pre-bankruptcy breach by the debtor.

*Id.*, at 23–24.

Westbrook argues that upon rejection a contract is *actually* breached. "Assume" and "reject" are, he says, "merely bankruptcy terms" for the decision to perform or to breach, Westbrook, *supra*, 74 Minn. L.Rev. at 231, 280, an election open to any party to a contract outside of bankruptcy. Andrew's exclusionary analysis "requires us to ignore the language and the structure of the Code," and to develop "a new set of special rules and concepts to understand the proper treatment of an obligation that hovers somehow outside of bankruptcy." *Id.* at 324. Westbrook is particularly concerned that the exclusionary analysis "leaves open the opportunity for the original debtor to attempt to proceed with the contract after the bankruptcy petition is filed," a result which is "unfair to the Other Party, as well as a trap for the wary." *Id.*, at 326.

> In effect, it creates an assumption-rejection right in the original debtor, requiring the Other Party to continue with a contract after the debtor has been stripped of all of its assets. It establishes a new twilight world of performance and breach with no statutory time limits on assumption or rejection and no court control.

*Id.*

In place of reading past history into the present Code, Westbrook proposes that we just read the Code.

> {T}he Code says 'the rejection of an executory contract or unexpired lease of the debtor constitutes a breach,' [§ 365(g)]. If ... treatment of rejection as breach leads to straightforward and intuitively correct results, why read this section out of the Code?

*Id.*, at 324. Westbrook also points to structural innovations in the Code to support his literal reading of § 365. The Code abolish-

---

**27.** Section 63 of the Act, **Debts which may be proved,** provided, in pertinent part:
 a. Debts of the bankrupt may be proved and allowed against his estate which are founded upon (1) a fixed liability, as evi-

denced by a judgment or an instrument in writing, absolutely owing at the time of the filing of the petition by or against him, whether then payable or not....

es the concept of provability in bankruptcy cases.[28] By redefining "claim" under the Code, and

giving it the broadest possible definition, and by the use of the term throughout ... title 11, ... the [Code] contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case. It permits the broadest possible relief in the bankruptcy court.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. (1977), reprinted in App. 2 *Collier on Bankruptcy*, II. H.R.Rep. 595 at 309 (15th ed. 1991)). The result of using an exclusionary analysis is that all claims against the debtor are in fact not "dealt with." Rather, some contract claims lurk in limbo outside the bankruptcy proceeding.

While Andrew believes that the Code continues the Act practice of not providing for "deemed rejection" of contracts not assumed in reorganization cases, Andrew, *supra*, 59 U.Colo.L.R. at 879–81, 883–84, Westbrook raises the possibility that the trustee not only "may assume or reject," § 365, but "indeed must" do so, Westbrook, *supra*, 74 Minn.L.Rev. at 335, "because the Code itself says just that." *Id.*, at 250. His brief, somewhat cryptic, mention of this possibility is supported by reference to § 365(g) and to *Societe Nationale Algerienne v. Distrigas Corp.*, 80 B.R. 606, 609 (D.Mass.1987). The case holds, as a matter of "black letter law" for which no authority is given, that "an executory contract *must* either be accepted or rejected in its entirety." (Emphasis added.) It is not clear from the context that the Court meant to say what it said, or whether its holding was implicitly limited to executory contracts which were in fact assumed or rejected. Also not conclusive is § 365(g), which provides, in pertinent part:

[T]he rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease—

(1) if such contract or lease has not been assumed under this section or under a plan confirmed under chapter 9, 11, 12, or 13 of this title, immediately before the date of the filing of the petition....

Section 365(g), read in conjunction with § 365(d)(2), which permits the trustee to exercise the assume-or-reject election "at any time before the confirmation of a plan," raises the possibility that the Code does indeed provide for "deemed rejection" in reorganization cases. This argument is strengthened by reference to the elimination of "provability" and the expanded definition of "claim," both indications that

modern bankruptcy law rests upon the fundamental policy of 'once and for all,' resolving all of the debtor's pre-petition affairs in one proceeding.

Westbrook, *supra*, 74 Minn.L.Rev. at 330.

■ Whether or not "deemed rejection" is now a feature of reorganization cases, we believe that the plain language of § 365, especially when read in the context of such changes in the structure of modern bankruptcy law as the abolition of "provability" and the expanded definition of "claim," compels the conclusion that a rejected contract is actually breached, and the breach is deemed to have occurred immediately preceding the bankruptcy filing. Accordingly, it is in this light that we determine Cohen's claims to the escrowed bonds.

## THE FUNCTIONAL APPROACH

■ The material breach test was Countryman's attempt to define "executory contract" "in the light of the purpose for which the trustee is given the option to assume or reject"—to benefit the estate. Countryman, *supra*, 57 Minn.L.Rev. at 450. In practice, although superior to the confusion that it replaced, Westbrook, *supra*, 74 Minn.L.Rev. at 237, application of the Countryman test can in some situations, as this matter illustrates, actually harm the estate and other creditors. Andrew and

28. But see, *In re Public Service Co. of New Hampshire*, 884 F.2d 11, 15 (1st Cir.1989), which relies both on an exclusionary analysis and the Act concept of "provability" for its holding that, because [the debtor] had "neither assumed nor rejected" the contract, it "continues in effect— and [the non-debtor party] has no provable claim thereunder against the bankrupt estate."

Westbrook have described three situations in which the Countryman test produces error:

> The first consists of cases concerned with whether particular contracts are "executory" as a preliminary to determining whether rejection will be permitted. The second consists of cases holding that when a contract is "executory" and is rejected, the contract is somehow destroyed or otherwise altered. The third category, an aggravated derivative of the second, is comprised of cases holding that rejection of a contract somehow destroys a right in or to property created by the contract, even if that right is otherwise good as against all competing claimants and as against the estate itself.

Andrew, *supra*, 59 U.Colo.L.R. at 884; Andrew, *supra*, 62 U.Colo.L.Rev. at 17, n. 71.[29]

The parties have, between them, urged us to join them in committing each one of these errors. Cohen would have us apply a test intended to ensure that the "assume-or-reject" election benefits the estate to enable him to strip it of millions of dollars. Debtor, on the other hand, would have us apply a doctrine developed to treat creditors fairly to vaporize its contracts with Cohen, and then to avoid his interests in the escrowed bonds. We decline these invitations to err.

"No bankruptcy policy is served" when Courts, in the exercise of their statutory obligation, subject the trustee's calculation to an "executoriness" requirement. Westbrook, *supra*, 74 Minn.L.Rev. at 282.

> If bankruptcy contract problems can be fully understood without reference to that requirement, it is surplusage and has no effect except confusion and obfuscation.... If that requirement never re-

strains the trustee from ... maximizing benefits to the estate, then it is irrelevant. If it sometimes prevents the trustee from maximizing the estate ... then it is pernicious. Because there is no bankruptcy policy or notion of fairness served by the executoriness requirement, it is irrelevant or pernicious in every case.

*Id.*, at 282–83.

Accordingly, we reject the Countryman test, and adopt instead an understanding of the "assume-or-reject" election of § 365 gleaned from the carefully reasoned articles of Professors Andrew and Westbrook:

> (1) "A bankruptcy estate is only liable administratively on a contract of the debtor if that liability is expressly assumed. Thus, the claims of parties to contracts that are rejected do not (unless they are secured) have priority over the claims of other creditors; they share *pro rata*."

Andrew, *supra*, 62 U.Colo.L.Rev. at 16.

> (2) "Rejection's effect is to give rise to a remedy in the non-debtor party for breach of the rejected contract, typically a right to money damages assertable as a general unsecured claim in the bankruptcy case. Rejection has absolutely no effect upon the contract's continued existence; the contract is not cancelled, repudiated, rescinded, or in any other fashion terminated."

*Id.*, at 16.

> (3) "There should be no threshold requirement that a contract be 'executory' as a prerequisite to assumption or rejection (performance or breach) by the trustee." [30]

Westbrook, *supra*, 74 Minn.L.Rev. at 335. "Rejection's limited effect renders unnecessary any definition of "executoriness"

---

**29.** Westbrook's characterization of the three categories of error generated by the Countryman test is as follows:

> Unfortunately, ... the test leads many courts to infer that executoriness must be found in a contract or it cannot be rejected.... The absurdity of that idea has been less damaging, however, than the next step taken by a number of courts, positing that obligations owed to the Other Party can be rejected right out of existence. The final, and most serious, com-

plex of errors in this line are the cases that suggest that rejection can void property interests created pre-petition by state law, even though they are not avoidable under the statutory avoiding powers. Westbrook, *supra,* 74 Minn.L.Rev. at 239 (footnotes omitted).

**30.** Andrew agrees that "executoriness" should not be a prerequisite to rejection, but disagrees, as we have already noted, that rejection should be characterized as a "breach." Andrew also

as a pre-condition to rejection.... Every contract may, without harm, be made subject to rejection; at worst, rejection will be superfluous."

Andrew, *supra,* 59 U.Colo.L.R. at 16–17.

(4) "Consistent with bankruptcy law's general deference to state-law rights in or to specific property, rejection of a contract does not terminate such rights that arise from rejected contracts. {R}ejection is not itself an avoiding power. Rights in property that arise from a contract may, however, be terminated by bankruptcy law's normal avoiding powers."

*Id.,* at 17.

(5) "The trustee's financial decision to perform or breach is made in light of the estate's right to pay in tiny Bankruptcy Dollars and its immunity from specific performance" of "purely contractual covenants."

Westbrook, *supra,* 74 Minn.L.Rev. at 335–36.

■ This understanding of the nature of the trustee's assume-or-reject option results in a simple four-step analysis. The trustee must first determine whether the contract gives to the non-debtor party an enforceable interest in property of the debtor that has passed to the estate. In the usual case, an enforceable interest might be a security interest; here, it is Cohen's interest in the escrowed bonds. The trustee must next consider whether any such interest of the non-debtor is avoidable under the Code's avoiding powers. If there is no such interest, or if it is avoidable, the trustee must determine whether the estate will benefit more from breach and payment of the resulting claim in Bankruptcy Dollars, or by performance. Finally, if the non-debtor has an unavoidable interest, the trustee must determine whether, under this circumstance, the estate will benefit most from breach or performance. *Id.,* at 336.

### DISCUSSION

We proceed accordingly, considering first the nature of Cohen's interests in the escrowed bond portfolios created by the parties' contract, and then the legal effect of that interest under New York law.

■ The Employment and Escrow Agreements creating the escrowed portfolios were carefully negotiated over a two-month period by highly skilled attorneys, who had in full view the possibility that this bankruptcy proceeding would ensue. While we must be careful not to elevate form over substance, form sometimes has substance. The language of the parties clearly evidences their intent and understanding that the bonds in fact belonged to Cohen. Article 4(D)(1) of the Employment Agreement provides that, "[o]n the Commencement Date, Drexel shall sell to [Cohen], and [Cohen] shall purchase from Drexel ... four separate portfolios," which "Drexel shall deliver ... to [Cohen] against payment therefore" by delivering them to the escrow agent. The Escrow Agreement's preamble states that "Drexel has sold to [Cohen] four separate portfolios of bonds," which were to be held in escrow "pending their release from ... restrictions or, alternatively, the sale of such bonds to Drexel under the circumstances provided for under the Employment Agreement." It was Cohen who was restricted from transferring any interest in them, Employment Agreement, Article 4(D)(2), and who received the interest they earned. Employment Agreement, Article 4(D)(3); Escrow Agreement, Article 2(B). Cohen was obliged to pay taxes on the interest earned on the bonds. Escrow Agreement, Article 5(A). In the event of Cohen's termination for cause, he was obliged to "redeliver" any portfolios remaining in the escrow to Debtor, and accept in full payment thereof the return of his $100–each payment, and would also receive all interest earned to the date of such termination. Article 4(D)(6).

argues that "a preliminary mutual-remaining-performance test is appropriate" as a prerequisite for assumption. Andrew, *supra,* 62 U.Colo. L.Rev. at 28. Westbrook argues that the trustee should always be free to decide based on his computation of the net benefit to the estate.

Westbrook, *supra,* 74 Minn.L.Rev. at 282–83. Each argues that the others' approach will result in unnecessary confusion. Andrew, *supra,* 59 U.Colo.L.R. at 30–31. Westbrook, *supra,* 74 Minn.L.Rev. at 327. The case at hand does not require us to decide this issue, so we don't.

Only such interest as the debtor has "as of the commencement of the case" passes into the estate. Section 541(a)(1); *In re TTS, Inc.*, 125 B.R. 411, 414 (Bkrtcy.D.Del. 1991). Section § 541 "is not intended to expand the debtor's rights against others more than they exist at the commencement of the case." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. (1977), reprinted in App. 2 *Collier on Bankruptcy*, II. H.R.Rep. 595 at 367 (15th ed. 1991).) See also, Andrew, *supra*, 59 U.Colo.L.R. at 10 ("only the debtor's interest in property becomes property of the estate"). "To the extent that an interest is limited in the hands of the debtor, it is, therefore, equally limited in the hands of the estate." 4 *Collier on Bankruptcy* 541.01 (15th ed. 1991). See also, *Matter of O.P.M. Leasing Services, Inc.*, 46 B.R. 661, 667 (Bkrtcy.S.D.N.Y.1985) (estate's interest in property is limited to same extent as the debtor's prepetition interest).

"Property interests are created and defined by state law." *Butner v. United States*, 440 U.S. 48, 55–56, 99 S.Ct. 914, 918–19, 59 L.Ed.2d 136, 141–42 (1979); *In re TTS, Inc.*, 125 B.R. 411, 413–14 (Bkrtcy. D.Del.1991) ("The Code itself does not determine the existence of a legal or equitable interest in property—reference to state law is required."). Accordingly, we must look to New York law to determine the legal effect of the parties' respective interests in the escrowed portfolios.

Bankruptcy Court Judge Lifland summarized the applicable principles of New York law in *In re O.P.M. Leasing*, supra, 46 B.R. at 667. First,

for an escrow to be valid the delivery of the property must be irrevocable. Although the grantor retains a contingent right to repossess the property if the specified condition does not occur, while the property is in the hands of the depository it must be beyond the possession and control of the grantor. If the grantor reserves the right to revoke the agreement, there is no escrow.

That requirement was met in this matter.

Second, "under New York law legal title to property placed in escrow remains with the grantor until the occurrence of the condition specified in the escrow agreement." *Id.*, at 667. Although Debtor argues that this requirement gives it legal title to the property, we believe it to be quite clear from the provisions of the contract we have recited that it was Cohen, not Debtor, who placed the escrowed bonds he had purchased into escrow.

Even legal title to the escrow would not help the Debtor, however, because of the effect of the third principle of New York law recited by Judge Lifland.

[T]he deposit of property placed in escrow 'creates in the grantee such an equitable interest in the property that upon full performance of the conditions according to the escrow agreement, title will vest at once in him.'

*Id.*, at 667, quoting 28 *Am.Jr.2d*, Escrow, § 10 (1964). This is true even where those conditions are satisfied postpetition, so long as the escrow was created prepetition, because, for Code purposes, the transfer " 'occurred when the escrow agreement was entered into and the funds turned over to the escrow agent.' " *Id.* at 668, quoting, *Newcomb v. Farmers Home Administration*, 744 F.2d 621, 627 (8th Cir.1984).

We conclude that under the terms of the parties' contract, Cohen held both legal title and the equitable interest in the escrowed bonds. The Debtor's only prepetition interest in the portfolios was a contingent right, in the form of a condition subsequent, to repurchase them in the event Cohen's employment was terminated for cause. Escrow Agreement, Article 4(A), 6(A); Employment Agreement, Article 4(D)(5)–(6). This was the only interest that passed into the estate. Accordingly, we hold that upon termination of his employment postpetition, all restrictions on the bonds were removed, Employment Agreement, Article 4(D)(5), and Cohen became entitled to immediate possession of them. Escrow Agreement, Article 4(A).

■ Whether or not transfer of the bond portfolios to Cohen is subject to one

of the Code's avoiding powers has not been placed in issue. In either case, however, the estate clearly benefits by rejecting its contract with Cohen. The estate benefits because rejection "constitutes a breach of such contract ... immediately before the date of the filing of the petition." § 365(g). Thus, the $3,732,734.83 balance owed Cohen after deduction of the value of bond portfolios becomes a general unsecured claim that can be paid in "tiny Bankruptcy Dollars," Westbrook, *supra,* 74 Minn.L.Rev. at 253, instead of real United States dollars. Accordingly, we grant the Debtor's motion to reject the contracts.

 At the same, however, we repudiate Debtor's contention that rejection vaporizes or otherwise avoids Cohen's interest in the escrowed funds. It is, as we have seen, inconsistent with the purposes for which Courts originally developed the assume-or-reject election, and the correlative principle that rejection constitutes a breach immediately before commencement of the bankruptcy. Moreover, there is no suggestion in § 365 or in the legislative history that Congress intended such a result. Finally, the view we adopt of rejection as an actual breach that is deemed to take place "immediately before the date of the filing of the petition," § 365(g)(1), provides an independent ground for awarding the escrowed bonds to Cohen. Even if his employment had not been terminated prior to rejection, thereby entitling him to the escrow, rejection, as a prepetition breach, in and of itself satisfies the conditions for Cohen to receive the portfolios free of all restrictions.

 We turn now to Cohen's claim that he is entitled to be paid the "Special Severance Payment" as an administrative expense, despite rejection of the contract. His argument teeters precariously on inapt analogy to unsound precedent, and ultimately depends for its success on our ruling that his contract is not executory, which we refuse to do. Cohen relies heavily on three Second Circuit cases decided under the Act, *Straus–Duparquet, Inc. v. Local Union No. 3,* 386 F.2d 649 (2d Cir. 1967); *Matter of Unishops, Inc.,* 553 F.2d

305 (2d Cir.1977); and *In re W.T. Grant Co.,* 620 F.2d 319 (2d Cir.1980).

*Straus–Duparquet* allowed the claims of union employees for a maximum of two weeks' severance pay as an administrative expense. The Court held:

> Since severance pay is compensation for termination of employment and since the employment of these claimants was terminated as an incident of the administration of the bankrupt's estate, severance pay was an expense of administration and is entitled to priority as such an expense.

*Straus–Duparquet,* supra, 386 F.2d at 651. A claim for two weeks' pay is different, not just in degree, but in kind, from a claim for three years' salary and bonuses. The fact that a claim for the former was allowed is no authority for allowing the latter. To allow Cohen's claim merely because the contract calls it a "severance" payment would elevate form, which may sometimes have substance, over a substance which is as to this issue as substantial as an elephant.

The Court in *Unishops* allowed the $100,000 severance pay claim of the debtor's chief executive officer, who worked for a period of eight months following filing of the bankruptcy petition. *Unishops,* supra, 553 F.2d at 308. The Court's holding was premised on the

> settled law that a claim arising under an executory contract is entitled to priority "if the trustee or debtor in possession elects to assume the contract or if he receives benefits under it."

*Id.,* quoting, *American Anthracite and Bituminous Coal Corp. v. Leonardo Arrivabene,* S.A., 280 F.2d 119, 124 (2d Cir. 1960). Because the former officer had "continued in Unishops' employ for some time" after the filing, the Court held, "we believe the debtor received benefits under the executory contract and, hence, the claimant is entitled to priority." *Id.* That holding, as to administrative expense status under Act § 64, was premised on rejec-

tion provisions unique to Chapter XI cases under the Act.[31]

> The failure to assume affirmatively does not result at any time in a rejection of the contract. [T]he contract can be rejected only by affirmative action under § 313(1)[32] and Chapter XI Rule 11–53[33] or § 357(2).[34] Unless so rejected, the contract continues in effect.

*Id.*, quoting 8 *Collier on Bankruptcy* 3.15[6] (14th ed. rev. 1975). The law has changed. Now, § 365 requires court approval before a contract can be assumed. "{F}iling of the petition in bankruptcy means that the [contract] is no longer immediately enforceable, and may never be enforceable again." *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 532, 104 S.Ct. 1188, 1199, 79 L.Ed.2d 482, 499 (1984).

> If the debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services, which, depending on the circumstances of a particular contract, may be what is specified in the contract. Should the debtor-in-possession elect to assume the executory contract, however, it assumes the contract *cum onere*.

*Id.*, 465 U.S. at 531, 104 S.Ct. at 1199, 79 L.Ed.2d at 499. (Citations omitted).

This Debtor elected, on April 25, 1990, two months after filing, not to be liable to Cohen for the reasonable value of his services after May 12, 1990, pending its decision to assume or reject, because it didn't need them. In *Unishops*, by contrast, the postpetition employment of the former officer in *Unishops* had been specifically approved by the Bankruptcy Court, and continued for eight months after the filing. Cohen attempts to evade *Bildisco* by arguing that (a) it bars only implied assumption of contracts by conduct, and (b) it only applies to executory contracts. The language quoted from *Bildisco* belies the first argument. As to the second, we refuse to read "executoriness" into *Bildisco*, and note further that even if we did, the Debtor elected not to receive further benefits from Cohen's employment at a time when the contract had all the "executoriness" that anyone could want.

*In re W.T. Grant Co.*, 620 F.2d 319 (2d Cir.1980), also an Act case, allowed as an administrative expense the severance pay claims of employees it had retained during a short-lived attempt at reorganization. Its holding relied on *Unishops* for the proposition that "an executory contract is binding on the debtor in possession if it receives benefits under it," and *Straus–Duparquet* for the proposition that "severance pay [is] compensation for termination." For the same reasons set forth in our discussion of those cases, *W.T. Grant* is no support for Cohen's argument.

A fourth case cited by Cohen devastates his position. *Trustees of Amalgamated Insurance Fund v. McFarlin's*, 789 F.2d 98, 101 (2d Cir.1986), holds that

> an expense is administrative only if it arises out of a transaction between the creditor and the bankrupt's trustee or debtor in possession, and "only to the extent that the consideration supporting

---

**31.** In liquidation cases, § 70b of the Act applied, under which the trustee's failure to assume a contract within specified time limits was a deemed rejection.

**32.** Section 313(1) of the Act, a part of Chapter XI, provided, in pertinent part:

Upon the filing of a petition, the court may
. . .
(1) permit the rejection of executory contracts of the debtor, upon notice to the parties to such contracts and to such other parties in interest as the court may designate....

**33.** Chapter XI Rule 11–53, **Rejection of Executory Contract,** provided:

When a motion is made for the rejection of an executory contract, including an unexpired lease, other than as part of the plan, the court shall set a hearing on notice to the parties to the contract and to such other persons as the court may direct.

**34.** Section 357(2) of the Act provided:

An arrangement within the meaning of this chapter may include—
. . . .
(2) provisions for the rejection of any executory contract....

the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business."

*Id.,* quoting, *In re Mammoth Mart, Inc.,* 536 F.2d 950, 954 (1st Cir.1976). (Other citations omitted). As Cohen ably argues, the Special Severance Payment "provided an inducement to [him] to join [Debtor], in the prime of his professional career at a time when he had a flourishing law practice" and was a "shield to protect [him] from unwarranted action by [Debtor]'s tainted management." Debtor "well understood that in becoming general counsel, [Cohen] might suffer reputational damage and was giving up a substantial law practice." Plaintiff's Reply Memorandum of Law in Further Support of Cross–Motion for Summary Judgment or in the Alternative Partial Summary Judgment, 14, 16. Clearly, then, the transaction was prepetition, and no beneficial consideration was supplied to Debtor postpetition. Accordingly, Cohen's administrative claim for the Special Severance Payment will be disallowed.

■■■ Finally, we address Cohen's claim that he is not subject to the claims allowance cap of § 502(b)(7). Section 502(b) provides, in pertinent part:

(b) {I}f ... objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—

....

(7) if such claim is the claim of an employee for damages resulting from the termination of an employment contract, such claim exceeds—

(A) the compensation provided by such contract, without acceleration, for one year following the earlier of—

(i) the date of the filing of the petition; or

(ii) the date on which the employer directed the employee to terminate, or such employee terminated performance under such contract; plus

(B) any compensation due under such contract, without acceleration, on the earlier of such dates....

Cohen first argues that his claim is not "for damages resulting from the termination of an employment contract." Rather, he says, he doesn't want damages but payment of the Special Severance Payment. Second, he argues that it was not his employment contract that was terminated, but his employment. We have just held that he is not entitled to payment of the Special Severance Payment as a postpetition administrative expense, so all he has left is a claim for damages. We hold that damage claim is limited by the cap imposed by § 502(b)(7). The line Cohen attempts to draw between termination of employment and termination of an employment contract cannot be plausibly maintained. While § 502(b)(7) does speak of "termination of an employment contract," § 502(b)(7)(ii) indicates that it is the termination of employment that matters. By rejecting the contract, the Debtor has breached it. The legislative history of § 507 clearly states that this provision "for damages resulting from the breach by the debtor of an employment contract ... limits the recovery to the compensation reserved under an employment contract for the year following the earlier of the date of the petition and the termination of employment." The Debtor's motion for summary judgment as to this issue will be granted.

To recapitulate: Cohen's motion for summary judgment will be granted with respect to the escrowed bonds. He is entitled to an order granting him immediate possession of the remaining portfolios, free of all restrictions. This holding does not preclude Debtor from attacking Cohen's right to the bonds under the Code's avoiding powers.

Debtor's motion for summary judgment will be granted in the following respects: Its motion to reject the contract with Cohen is granted. Cohen's claim to administrative priority for the Special Severance Payment will be disallowed, without prejudice to his right to file an amended proof of claim for (a) the reasonable value of any

uncompensated services provided postpetition as an administrative expense, and (b) an unsecured claim for damages suffered as a result of the termination of his employment. The damages limitation cap of § 502(b)(7) applies to his damage claim.

Counsel for Debtor is to settle the order.