**In re MID–AMERICAN WASTE SYSTEMS, INC., et al., Debtors.**

**No. 97–104–PJW.**

United States Bankruptcy Court, D. Delaware.

Jan. 3, 2001.

**114**

John E. James, Laurie Selber Silverstein, William A. Hazeltine, Potter Anderson & Corroon LLP, Wilmington, DE, for Hobart G. Truesdell, Plan Administrator for Mid–American Waste Systems, Inc.

Adam Singer, Cooch & Taylor, Wilmington, DE, Robert J. Sidman, Vorys, Sater, Seymour and Pease LLP, Columbus, OH, for Christopher White.

## MEMORANDUM OPINION

PETER J. WALSH, Bankruptcy Judge.

Before the Court is the motion for summary judgment (Doc. # 1021) of the Plan Administrator of Mid–American Waste Systems, Inc. ("MAWS") on his objection to the proof of claim of Christopher White ("White"). White bases his claim of $5,863,115.26 (Claim No. 00420) on MAWS' alleged breach of his employment contract and his alleged right to "golden parachute"

benefits. Response of White,[1] p. 7 (Doc. # 817). MAWS moves for summary judgment on the following grounds: (1) White's voluntary resignation bars a claim for breach of his employment contract; (2) White is not entitled to a "golden parachute" because there was no change of control at MAWS as required under the employment contract; (3) all such claims are subject to the limitations of 11 U.S.C. § 502(b)(7)[2]; and (4) White's claim, if any, should be equitably subordinated under § 510(c) because of White's admitted criminal conduct.

For the reasons discussed below, I will allow the motion for summary judgment in part. First, I hold that there was no change of corporate control at MAWS as defined in White's employment contract ("Change of Control") and accordingly, White is not entitled to any "golden parachute" benefits. Second, I hold that White's claim, if any, is subject to the limitations of § 502(b)(7).

## BACKGROUND

On January 21, 1997, MAWS and its thirty-one subsidiaries filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On September 17, 1997, I entered an order confirming MAWS' Amended Joint Liquidating Plan of Reorganization (the "Plan") under which Hobart E. Truesdell acts as Plan Administrator. Truesdell is authorized to object to claims against reorganized MAWS' estate. The confirmation order provides that any executory contract not previously assumed by MAWS is deemed rejected under § 365 as of the date of the confirmation order. Findings of Fact, Conclusions of Law, and

---

1. The pleading (Doc. # 817) is captioned in full: Response of Christopher White to Mid–American Waste Systems, Inc.'s Second Objection to Proofs of Claim of Former Officers and Directors.

2. Unless otherwise indicated, all references to " § ____" are to a section of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

Order Under 11 U.S.C. §§ 1129(a) and (b) and Fed.R.Bankr.P. 3020 Confirming Amended Joint Liquidating Plan of Reorganization of Mid–American Waste Systems, Inc. and Subsidiaries, Dated July 23, 1997, as Modified, pp. 25–26, ¶ 41.

White formed MAWS in 1985 to buy and operate solid waste collection operations and landfills. MAWS was apparently successful until the mid–1990s when allegations of wrongdoing and accounting irregularities triggered its demise. The present controversy concerns the characterization of White's departure as Chief Executive Officer ("CEO") and Chairman of the Board of Directors in early 1996 and the legal effect of his resignation.

The parties do not dispute the following facts. White and MAWS entered into an employment contract on March 3, 1993 ("Employment Contract") under which White was to serve as CEO and President for an initial term of four years at an annual salary of $425,000.00 plus certain fringe benefits. White also served on the Board of Directors. In 1995, MAWS and White became the target of a federal grand jury investigation involving, *inter alia*, charges of bribery, illegal campaign contributions in federal elections, and misappropriation of funds. On February 6, 1996, White took a leave of absence from MAWS. On April 12, 1996, White tendered a letter of resignation.

On the day he resigned, the federal grand jury issued an indictment charging White and five other defendants with viola-tions of federal law in seventeen counts, including bribery and conspiracy to commit bribery. On September 20, 1996, the grand jury issued a second superseding indictment against White only, charging him with sixteen counts including racketeering, fraud and bribery. On September 19, 1997, White plead guilty to a felony bribery charge. A subsidiary of MAWS also entered a *nolo contendere* plea on a bribery charge and MAWS itself plead guilty to a misdemeanor charge of improper campaign contribution practices.

The parties dispute the remaining facts. According to White, the following events caused his resignation.

In 1995, a primary stockholder and former director, John L. Kemmerer ("Kemmerer") commenced a proxy fight to gain control of MAWS' Board of Directors ("Board"). White Brief,[3] (Doc. # 1045) p. 3, ¶ C. On September 28, 1995, MAWS and Kemmerer entered into a settlement agreement to resolve the proxy contest. White Brief, Exh. C (Proxy Materials dated October 5, 1995), p. 2. Under the settlement, the Board agreed to nominate three new directors for election to the Board thereby expanding the Board from seven to ten. White Brief, p. 3, ¶ C; Exh. C (Proxy Materials dated October 5, 1995), pp. 2–4. According to the proxy material, Kemmerer and White "personally agreed to support" all Board nominees. *Id.; see also* MAWS' Reply Brief[4] (Doc. # 1049), pp. 12–13.

---

**3.** White's brief (Doc. # 1045) is captioned in full: Opening Brief of Christopher White in Opposition to the Motion for Summary Judgment of the Plan Administrator of Mid–American Waste Systems, Inc., Debtor, as to his Objection to Proof of Claim No. 00420—The Christopher White Employment Claim ("White Brief"). White attached numerous exhibits including a copy of his employment agreement, proxy material dated October 5, 1995, MAWS Bylaws, various deposition transcripts, copies of Board meeting minutes, and several affidavits. MAWS does not contest the authenticity of the attachments.

**4.** The pleading (Doc. # 1049) is captioned in full: Reply Brief in Support of the Motion for Summary Judgment of the Plan Administrator of Mid–American Waste Systems, Inc., Debtor, as to his Objection to Proof of Claim No.

The Board then nominated Richard J. Puricelli ("Puricelli"), Martin L. Garcia ("Garcia"), and Gene A. Meredith ("Meredith") as new directors. Exh. C (Proxy Materials dated October 5, 1995), pp. 2–4; MAWS' Reply Brief, p. 12. It also nominated White (first elected in 1985), Dennis P. Wilburn (first elected in 1985) ("Wilburn"), and J. Grant Troja (first elected in 1994) ("Troja") for reelection. *Id.* The Board's continuing Directors were R. Jay Robert (first elected in 1991), Ben H. Love (first elected in 1993) ("Love"), Thomas A. Brown (first elected in 1991) ("Brown"), and John D. Peckskamp, Jr. (first elected in 1986) ("Peckskamp"). Exh. C (Proxy Materials dated October 5, 1995), pp. 2–4. In late 1995, the shareholders elected the nominated directors.

According to White, the "new" Board then began to plot his exit from MAWS with the intent of making him the scapegoat for MAWS' recent financial difficulties. White Brief, at 3, ¶ C. White accuses the Board of holding unlawful, secret meetings and of doctoring Board minutes. *Id.,* p. 6. He claims these meetings culminated in the Board's unilateral decision to fire him without cause. *Id.,* p. 5.

White states that on February 6, 1996 he was approached by Brown, then Chairman of the Compensation Committee, and told to take an involuntary leave of absence. White Brief, p. 8. White claims Brown assured him he would continue to receive a salary and benefits, including reimbursement of White's legal fees incurred during the criminal investigation pending against him. *Id.,* p. 9. White took a leave of absence. He admits MAWS' paid his salary and benefits through February 1996. *Id.*

According to White, MAWS ceased paying his salary after the first week of March 1996. White Brief, p. 12, ¶ G. White claims that this placed him under extreme pressure. He felt abandoned by his own company, he faced substantial legal bills and a pending criminal indictment, and he had no salary or benefits for himself or his wife and five children. *Id.* Against this background, the Board demanded White's resignation. *Id.* Consequently, White entered into a negotiated compromise embodied in an agreement ("Resignation Agreement") dated April 12, 1996, pursuant to which he tendered his written resignation. *Id.* White claims he lacked the means to assert and enforce his employment contract at the time. White Brief, p. 12, ¶ G.

White has not received any compensation from MAWS since payment for the first week of March 1996. Response of White, p. 4 and n. 3. He has not initiated any action against MAWS to recover money other than filing a proof of claim in MAWS' bankruptcy case.

MAWS disputes White's characterization of the events leading to his resignation. According to MAWS, the Board did not hold "secret" meetings. Instead, the full Board had authorized outside directors to meet separately to discuss issues related to the federal grand jury investigation of MAWS and White. MAWS' Opening Brief,[5] (Doc. # 1014) pp. 6–7, ¶ C. Based

00420—the Christopher White Employment Claim.

5. MAWS' pleading (Doc. # 1014) is captioned in full: Opening Brief in Support of the Motion for Summary Judgment of the Plan Administrator of Mid–American Wastes Systems, Inc., Debtor, as to His Objection to Proof of

Claim No. 00420—the Christopher White Employment Claim. MAWS attached numerous exhibits including copies of Board meeting minutes; affidavits; a copy of White's employment agreement; and deposition testimony. White contests the substantive validity of several Board minutes because he claims the Board doctored the minutes to conform with

on these meetings, the outside directors asked Brown to meet with White on February 6, 1996, to explore White's interest in taking a leave of absence. *Id.*

MAWS admits that White raised questions about compensation at the February 6 meeting. It claims however, that Brown told White he was not authorized to make any commitments as to compensation, and that Brown in fact made no such commitment. *Id.* MAWS also claims Brown never told White he must leave, or that he was directed to tell him to do so by the Board. *Id.*

According to MAWS, the Compensation Committee offered White a severance package in exchange for his resignation and appropriate releases after the February 6 meeting. MAWS' Opening Brief, p. 8. The package would have comprised 30% of White's salary and continued health benefits. *Id.* MAWS claims that White rejected this offer, and that he instead chose to resign voluntarily on April 12, 1996 pursuant to the Resignation Agreement. *Id.* MAWS denies that any of its directors made oral promises to White regarding the terms of his resignation or the possibility of future compensation. MAWS' Opening Brief, p. 9–11.

White filed his proof of claim on May 28, 1997. He seeks (1) damages based on breach of the Employment Contract in the form of unpaid salary, bonuses, and benefits including attorneys' fees, totaling $1,188,538.42; and (2) a "golden parachute" payment under the Employment Contract triggered by its Change of Con-

trol provisions totaling at least $4,674,576.84.[6] Response of White, p. 7. In his brief, White also asserts a right to compensation and attorneys' fees based on Brown's oral assurances at the February 6 meeting.

MAWS objects to White's proof of claim on the following grounds: (1) White's voluntary resignation precludes a claim for breach of an employment contract and even had White not resigned, MAWS would have terminated him for cause; (2) White has no right to a "golden parachute" payment because there was no Change of Control at MAWS, nor did White leave following such an alleged change, as required under the Employment Contract; (3) White's claim is based on damages resulting from the termination of an employment contract and is therefor subject to the limits in § 502(b)(7); and (4) White's claim, if any, should be equitably subordinated under § 510(c). MAWS has moved for summary judgment on all issues. I will address each in turn.

## DISCUSSION

### I. Summary Judgment Standard.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).[7] The moving party has the burden of establishing that there are no genuine issues of material fact. *Celotex*

their illegal conduct. He does not contest the accuracy of the copies.

**6.** White has apparently added an additional $5,962.50 in attorneys' fees to his claim since he filed his response. In this opinion I make no ruling on whether White has an allowed claim. I also make no ruling on the numeric amount of White's claim, if any. Accordingly,

for purposes of this opinion, I will rely on the numbers White submitted in his response to MAWS' objection. *See* Doc. # 817.

**7.** Fed.R.Bank.P. 9014 and Fed.R.Bank.P. 7056 make Fed.R.Civ.P. 56(c) applicable to contested matters in bankruptcy.

*Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

In ruling on a motion for summary judgment, I draw inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Big Apple BMW, Inc. v. BMW of North America, Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992). I take as true the evidence of the non-moving party where such evidence contradicts that of the movant's. *Big Apple BMW,* 974 F.2d at 1363. However, a party must exceed the "mere scintilla of evidence" threshold and may not simply advance conclusory statements and allegations. *Id.* I evaluate the material facts against the substantive proof required. *Id.* at 1364.

Finally, Rule 56 does not authorize a trial by affidavit. *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513. I must refrain from making an ultimate determination as to the credibility, weight and veracity of the evidence. *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513; *Big Apple BMW,* 974 F.2d at 1363. Rather, I must decide whether there exists a genuine dispute on a material fact suitable for trial, i.e., if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Big Apple BMW,* 974 F.2d at 1363.

## II. White's Claim for Breach of Employment Contract.

### A. White's Resignation.

■ I turn first to MAWS' argument that White's voluntary resignation bars his breach of contract claim as a matter of law. White responds that his resignation was involuntary and thus had no legal effect. Section 12 of the Employment Contract provides that Ohio law governs its interpretation.

■ In general, an employee's voluntary resignation is a termination of the employment contract by the employee and therefor precludes a breach of contract claim against the employer. However, Ohio courts may consider a resignation involuntary and therefor ineffective if the employee resigns under duress or the employer coerces the employee to resign. *See, e.g., Deoma v. City of Shaker Heights,* 68 Ohio App.3d 72, 587 N.E.2d 425, 429 (1990); *Kinney v. Ohio State Dep't Admin. Serv.,* 14 Ohio App.3d 33, 469 N.E.2d 1007, 1009–10 (1984). Under these circumstances, the court deems the employee "constructively discharged." *See, e.g., Deoma,* 587 N.E.2d at 429; *Kinney,* 469 N.E.2d at 1009–10.

White alleges that MAWS forced him to resign, *inter alia,* by threatening him with termination and placing him in financial duress. He also raises the possibility that MAWS breached the Employment Contract before White's resignation when MAWS stopped paying his salary. In either event, viewing the pleadings and affidavits in a light most favorable to White, I find that he raises a genuine issue of material fact as to the voluntariness of his resignation and its legal effect on the Employment Agreement. Accordingly, I deny summary judgment on whether White's resignation precludes a breach of employment contract claim against MAWS.

For the same reasons, I also deny summary judgment on MAWS' two related arguments. MAWS argues that even if White resigned involuntarily, he still has no claim for breach of contract because MAWS would have terminated him for cause. White denies MAWS had cause to fire him, or that it intended to do so. MAWS also maintains that White has no claim because White rendered no performance under the Employment Contract following his resignation. White responds

that the Resignation Agreement relieved him of this duty. I find that both of these arguments depend on a factual determination of the voluntariness of and circumstances surrounding White's resignation. Accordingly, I deny summary judgment on these issues.

## B. The Resignation Agreement.

■ White also raises two additional reasons why his resignation, even if voluntary, does not bar his breach of contract claim against MAWS. First, he argues that paragraph four of the Resignation Agreement preserves his rights under the Employment Contract such that his resignation does not preclude a claim for its breach. Second, he seems to argue that the Resignation Agreement is effectively a second contract like a severance agreement whose benefits are defined by the terms of the Employment Agreement.

The relevant provisions of the Resignation Agreement provide as follows:

1. Mid–American will pay the invoices previously received from Jenner & Block for legal services on behalf of Chris White in the amount of approximately $62,000.00

2. In return, Chris White will resign from the Board of Directors and the employ of Mid–American Waste Systems, Inc. effective immediately.

3. Pursuant to the undertaking and Delaware law, Mid–American reserves any and all rights it has to seek reimbursement from Chris White with regard to fees, expenses and other costs advanced in the event there is an adverse finding in the Indiana criminal proceedings.

4. Chris White reserves any and all rights he has to seek reimbursement from Mid–American Waste Systems, Inc. for legal expenses, salary and other

benefits, if any, as if he had not resigned from the Company.

White Brief, Exh. O.

According to White, paragraph four memorializes an intent to preserve MAWS' duty to perform, and White's rights under, the Employment Contract. He claims his resignation was a publicity maneuver and that he agreed to stop working but not to terminate the Employment Contract. MAWS responds that paragraph four is simply a reservation of rights, similar to paragraph three, which allows White to enforce rights to which he is entitled because of his performance, if any, under the Employment Contract.

■ Under Ohio law, when parties to a contract dispute its meaning, I first look to the four corners of the contract to determine whether an ambiguity exists. See *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 374 N.E.2d 146, 151 (1978); *Lawler v. Burt*, 7 Ohio St. 340, 350, 1857 WL 52, *7 (Ohio, 1857). If the contract contains "clear and precise terms," it is not ambiguous and I am not permitted to refer to evidence outside the contract, such as the intent of the parties, when I interpret the contract. *Buckeye Pipe Line*, 374 N.E.2d at 150; *Burt*, 7 Ohio St. at 350, 1857 WL 52, *7. The question whether a contract is ambiguous is one of law. *Amstutz v. Prudential Ins. Co. of America*, 136 Ohio St. 404, 26 N.E.2d 454, 456 (1949). Once I determine ambiguity exists, the meaning and intent of the words used presents a question of fact. *Amstutz*, 26 N.E.2d at 456; *Buckeye Pipe Line Co.*, 374 N.E.2d at 150.

I find an inherent ambiguity in the language under which White "reserves any and all rights" including salary, "as if he had not resigned." On its face the provision contradicts an intent to resign in full. And I see no reason why parties could not agree to keep an employment contract in

effect following an employee's resignation. In the alternative, concluding that the language embodies another agreement is possible. At a minimum, reasonable minds could differ whether MAWS and White intended to terminate the entire employment relationship on April 12, 1996.

White therefore raises a genuine issue of material fact with respect to the meaning of the Resignation Agreement and its effects on the Employment Contract. As a result, I deny summary judgment on White's breach of Employment Contract claim against MAWS.

### III. Change of Control.

■ Most of White's proof of claim is based on his alleged right to a "golden parachute" payment. The term refers generally to an agreement between a corporation and its top officers which guarantees those officers continued employment, payment of a lump sum, or other benefits if there is a change of corporate ownership. *Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1, 3 n. 2, 105 S.Ct. 2458, 2460 n. 2, 86 L.Ed.2d 1 (1985). The parties do not contest that the Employment Agreement includes such a provision and they agree it is unambiguous.

■ The interpretation of an unambiguous contract is a matter of law. *State ex rel. Parsons v. Fleming,* 68 Ohio St.3d 509, 628 N.E.2d 1377, 1379 (1994). Under the Employment Contract, White has a right to "golden parachute" benefits on termination of employment only after a change in control of the corporation.[8] Employment Contract, §§ 4, 5. Section 4(a) provides that a Change of Control is deemed to occur if:

(i) Any "person" ... is or becomes the "beneficial owner" ... directly or indirectly, of securities of the Corporation representing twenty percent (20%) or more of the combined voting power of the Corporation's then outstanding securities;

(ii) During any period of two (2) consecutive years (not including any period prior to the execution of this Agreement), there shall cease to be a majority of the Board comprised as follows: individuals who at the beginning of the Employment Period[9] constitute the Board and any new director(s) whose election by the Board or nomination for election by the Corporation's stockholders was approved by a vote of at least two-thirds (2/3) of the directors then still in office who either were directors at the beginning of the Employment Period or whose election or nomination for election was previously so approved; or

(iii) The shareholders of the Corporation: (a) approve a merger or consolidation of the Corporation...; or (b) approve a plan of complete liquidation of the Corporation ...[10]

---

8. Section 5 provides in relevant part: "If any of the events described in Section 4 constituting a Change in Control of the Corporation shall have occurred, Employee shall be entitled to the benefits provided in Section 8 hereof immediately upon a termination of his employment which occurs during the term of this Agreement, if such termination is for Good Reason. For purposes of this Agreement, 'Good Reason' shall mean, without Employee's express written consent, the occurrence after a Change in Control of the Corporation of any one (1) or more of the following..."

9. The Employment Period is defined as forty-eight months from the date of the Employment Contract. Employment Contract, § 1. The date of the Employment Contract is March 3, 1993.

10. Section 4(a) also defines a change of control as one that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A promulgated under the

White alleges the following events establish a Change of Control: (1) on February 6, 1996, MAWS held an illegal Board meeting in which the Board named Meredith CEO, purportedly replacing White; (2) in March 1996, MAWS unilaterally announced it would no longer honor the Employment Contract; (3) a majority of the Board materially changed since the beginning of the Employment Period; and (4) there has been a liquidation or sale of substantially all assets of MAWS. Response of White, p. 6 n. 7.

At the outset, I note that Change of Control is a defined term. White's allegations of MAWS' illegal Board meetings, breach of contract, and unlawful conduct, even if true, are therefore irrelevant. Section 4(a) does not provide that any of these events is a Change of Control. White has also not alleged, or established, that any one person or entity acquired shares representing more then 20% of the combined voting power of MAWS' outstanding stock before White's termination of employment. I therefor hold that there was no Change of Control at MAWS under § 4(a)(i) of the Employment Agreement.

█ I also hold that White has failed to establish a Change of Control as defined under § 4(a)(ii). The evidence submitted by White shows that in 1995 the existing Board, including White, approved three new directors for election to the Board. This increased the size of the Board from seven to ten. All the existing directors approved the new directors, including White. Therefore, after addition of the new directors, the majority of the Board consisted of (1) directors who were on the Board at the beginning of White's Employ-ment Period (White, Wilburn, Roberts, Brown and Peckskamp) and (2) new directors (Meredith, Puricelli and Garcia) who were nominated by two-thirds of the directors on the Board at the beginning of White's Employment Period (White, Wilburn, Roberts, Brown and Peckskamp). . Accordingly, White has failed to show a Change of Control within the meaning of § 4(a)(ii).

Interpreting the evidence in a light most favorable to White, it is possible to conclude that directors who served on the Board at the beginning of White's Employment Period no longer comprised the majority of the Board after the election. This alone, however, is not a Change of Control. Section 4(a)(ii) requires that the majority of the Board cease to be *either* directors who were on the board at the beginning of the Employment Period *or* new directors whose election to the Board was approved by a vote of at least two-thirds of directors who were on the Board at the beginning of the Employment Period.

A careful reading of the material submitted by White shows that Troja, elected to the Board in 1994, and Love, elected to the Board in May 1993, apparently were *not* on the Board at the beginning of White's Employment Period that commenced March 3, 1993. However, two-thirds (five out of seven) of the directors (White, Wilburn, Roberts, Brown and Peckskamp) who approved nomination of the new directors (Meredith, Garcia and Puricelli) *were* directors at the beginning of the Employment Period. Thus, the requisite number of existing directors approved the new directors.[11]

---

Securities Exchange Act of 1934, as amended. The parties apparently agree this provision does not apply.

11. I am not convinced that § 4(a)(ii) requires that an otherwise qualifying change in the Board's composition must persist in duration for twenty-four months before it is deemed a Change of Control as MAWS argues. The phrase "[d]uring any two (2) consecutive years" could as well mean that the entire

■ Finally, White asserts that MAWS' liquidation in its chapter 11 case is a Change of Control under § 4(a)(iii). White does not pursue this argument. His only reference to the issue is in footnote 7 of his response to MAWS' supplemental opposition to his proof of claim. White does not offer a "mere scintilla" of evidence that MAWS' shareholders approved a plan of complete liquidation or sale of all MAWS' assets as required under § 4(a)(iii). White therefore fails to carry his burden of proof to withstand summary judgment on this issue. *See Big Apple BMW*, 974 F.2d at 1363.

I note that even if I were to assume MAWS' liquidation in its chapter 11 case falls within § 4(a)(iii), White still is not eligible for the "golden parachute" payment. Section 5 of the Employment Contract requires that White end his employment *after* a Change of Control occurs. It is undisputed that White ceased working for MAWS as of April 12, 1996, approximately eight months before MAWS filed for chapter 11 protection. Consequently, White's employment did not terminate following a Change of Control as his contract requires. This is true even if White can establish that the contract itself was not terminated on April 12, 1996.

In sum, I hold that White has not alleged facts or submitted evidence that establishes a Change of Control at MAWS as defined in the Employment Contract. White therefore has no claim based on a Change of Control and is not entitled to a "golden parachute" payment. Accordingly, I will grant MAWS' motion for summary judgment and sustain its objection to White's proof of claim to the extent it is based on a Change of Control under his Employment Contract.

I note this holding is not affected by the validity of White's resignation. In other words, White is not allowed to resuscitate his claim to Change of Control benefits in the event he establishes his resignation was invalid. White is not entitled to Change of Control benefits because there was no Change of Control given the facts alleged, regardless of the circumstances surrounding his resignation.

## IV. Section 502(b)(7).

MAWS next moves for summary judgment on its argument that White's claim, if any, is subject to the limitations of § 502(b)(7). White does not dispute characterization of his claim as one for damages resulting from termination of an employment contract other than his request for attorneys' fees. He nevertheless argues that § 502(b)(7) does not apply.

Section § 502(b)(7) mandates a one year limitation on breach of employment contract claims. The statute provides in relevant part:

(b) [I]f [an] objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim as of the date of the filing of the petition, and shall allow such claim . . . in such amount, except to the extent that—

(7) if such claim is the claim of an employee for damages resulting from the termination of an employment contract, such claim exceeds—

(A) the compensation provided by such contract, without acceleration,

change in the Board's composition must occur *within* a twenty-four month period rather than for the *duration* of such period. The clause lends itself to either interpretation. I do not need to resolve the matter, however, to hold that the facts as urged by White do not establish a Change of Control under § 4(a)(ii). The two-year requirement is in addition to the factors which define a change in the Board's composition, and is therefore not implicated if no such change has occurred.

for one year following the earlier of—

(i) the date of the filing of the petition; or

(ii) the date on which the employer directed the employee to terminate, or such employee terminated, performance under such contract; plus

(B) any unpaid compensation due under such contract, without acceleration, on the earlier of such dates;

. . .

11 U.S.C. § 502(b)(7).

■■■ White first argues that § 502(b)(7) does not apply because Congress intended the provision to only limit damages flowing from MAWS' bankruptcy or its immediate consequences. He maintains the events that caused his damages happened in 1996 and are thus too remote to fall within the ambit of the statute.

The Court of Appeals for the Third Circuit has rejected this argument. "[T]he express terms of § 502(b)(7) . . . mandate that this section be interpreted to place a cap upon all employment contract termination claims, regardless of whether: (1) the claim has been reduced to judgment; (2) there is any connection between the employee's termination and the debtor's financial problems; and (3) a number of years has passed between the employee's termination and the debtor's filing of the bankruptcy petition. All of these considerations are irrelevant." *Anthony v. Interform Corp.*, 96 F.3d 692, 697 (3d Cir.1996). I therefore hold that White's claim, if any, is subject to § 502(b)(7) regardless of when the events occurred on which he bases his claim.[12]

■■■ White next argues that § 502(b)(7) does not apply on its face because MAWS terminated his employment, not his employment contract, and the statute speaks only of a "termination of employment contract." He asserts that although he ceased working on April 12, 1996, the Employment Contract, and MAWS' performance thereunder, remained in effect until MAWS rejected the contract through Plan confirmation on September 17, 1997.

I am not persuaded that White's technical distinction between termination of employment and termination of an employment contract is consistent with the Bankruptcy Code. It is also at odds with his position that the events that led to his damages are remote and thus not a consequence of MAWS' bankruptcy.

■■■ A debtor's rejection of an executory contract under § 365(a) is deemed a prepetition breach. 11 U.S.C. § 365(g)(1). As a result, the non-debtor party has a prepetition claim against the debtor that is deemed to have arisen immediately before the filing of the petition. *See, e.g., In re Hooker Inv., Inc.*, 145 B.R. 138, 144 (Bankr.S.D.N.Y.1992); *Cohen v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 138 B.R. 687, 695 n. 12 (Bankr.S.D.N.Y. 1992) (noting that even a post petition breach is treated as a prepetition liability where the contract was executed prepetition).

Consequently, even if White can establish that MAWS did not terminate his Employment Contract until September 1997, the Bankruptcy Code nevertheless defines White's claim as a prepetition breach.[13] That his physical employment

---

12. The legislative history and policies underlying application of § 502(b)(7) in this manner are fully explained in the Third Circuit's opinion and I see no reason to repeat the analysis here. *See Anthony*, 96 F.3d at 693–97.

13. White does not argue, nor can he on the facts alleged, that a portion of his damages

may have ended earlier is relevant for calculating damages, but not for determining applicability of the statute. *Accord Drexel Burnham,* 138 B.R. at 713 ("While § 502(b)(7) does speak of 'termination of an employment contract,' § 502(b)(7)(ii) indicates that it is the termination of employment that matters"); *In re Hooker Investments,* 145 B.R. at 144. I therefore hold that White's claim, if any, is subject to § 502(b)(7) regardless .of whether the Employment Contract terminated pre or post petition.

■ Finally, White argues that § 502(b)(7) does not apply to his attorneys' fees because they do not arise under his Employment Contract. According to White, he is entitled to attorneys' fees because Brown promised that MAWS would pay his legal expenses at the February 6, 1996 meeting. He also relies on MAWS' alleged internal policy of paying its employees' job-related legal expenses.

■ I agree with White that § 502(b)(7) generally only applies to claims which stem from termination of the employer-employee relationship. *See, e.g., Irvine–Pacific Commercial Ins. Brokers, Inc. v. Adams,* 228 B.R. 245, 247 (9th Cir. BAP 1998) (fully vested retirement benefits of former employee not subject to § 502(b)(7) because claim not based on termination of employment contract). There is little case law on whether attorneys' fees that arise during this relationship are also subject to § 502(b)(7). It seems to me that if White has a right to attorneys' fees because of his Employment Contract, then the fees are subject to § 502(b)(7) because they are incidental to his contract.

The District Court for the Middle District of Florida addressed this issue and reached a similar conclusion. *See*

*Schleicher v. Murray Indus., Inc. (In re Murray Indus., Inc.),* 147 B.R. 597 (M.D.Fla.1992) *aff'd* 998 F.2d 1021 (11th Cir.1993). In *Murray Indus.,* the District Court affirmed the Bankruptcy Court's holding that the calculation under § 502(b)(7) properly includes both employment compensation and attorneys' fees as damages subject to the one-year cap. 147 B.R. at 601.

The District Court relied on the legislative history of § 502(b)(7) which suggests the provision is analogous to the limitations on lease rejection damages under § 502(b)(6). *Id.* at 601 n. 2. Lease termination damages typically include the calculation of attorneys' fees. *Id.* at 601. Accordingly, the District Court affirmed the Bankruptcy Court's ruling that the employee's claim, including both compensation and attorneys' fees, was subject to § 502(b)(7). *Id.* at 600–01.

I find this reasoning persuasive. I therefore hold that White's claim is subject to § 502(b)(7) and properly includes attorneys' fees if his entitlement to such fees arises under the Employment Contract. I note this includes a claim for attorneys' fees based on Brown's alleged oral promise to honor White's Employment Contract during and after White's leave of absence. The alleged oral promise does not change the fact that White's entitlement to attorneys' fees arises under the Employment Contract. I make no finding at this time on the existence or enforceability of the oral promise.

I also hold that White has not established a right to attorneys' fees beyond the scope of his Employment Contract. At the outset, I note that White bases his proof of claim only on damages flowing from MAWS' alleged breach of contract. In his own words, "[t]he [Employment]

are entitled to administrative expense priori- ty.

Agreement contains the contractual basis for the White Claim, and the calculation of the amount of that Claim . . . is derived directly from the provisions of that [Employment] Agreement." Response of White, p. 3. He calculates his damages, including unreimbursed attorneys' fees totaling $350,000.00, solely in terms of MAWS' breach of the Employment Contract. *Id.*, pp. 2–3. Accordingly, on its face, White's claim is subject to § 502(b)(7).

 Even if I were to entertain White's argument that he has a noncontractual basis for attorneys' fees, I hold that White has failed to carry his burden of proof to withstand summary judgment. White argues he is entitled to attorneys' fees based on Brown's oral promise, which I have already addressed, and on MAWS' alleged corporate policy of reimbursing its employees' legal expenses. White Brief, p. 27, ¶ 3. White fails to provide any written company policy supporting his allegation. Nor does White give examples of specific prior instances which establish that MAWS routinely paid such fees, other than a passing allegation that MAWS once paid attorneys' fees for Steve Montee, a former employee. White Brief, Exh. G (Affidavit of Christopher White), p. 4, ¶ 9. Furthermore, White cites no legal authority that Ohio law recognizes an implied contract based on a corporate policy manual, employee handbook, or a company's prior conduct. All he offers to support a noncontractual basis for attorneys' fees is his conclusory and self-serving statement that MAWS' policy was to pay its employees' legal expenses.

In sum, I hold that the damages subject to § 502(b)(7) properly include White's claim for attorneys' fees because his entitlement to such fees is based on his Employment Contract, if at all. I also hold that White has failed to carry his burden of proof to withstand summary judgment on whether a separate basis exists for reimbursement of his legal expenses. Accordingly, I grant MAWS' motion for summary judgment on this issue. Based on the evidence submitted, the entirety of White's remaining claim, if any, is subject to § 502(b)(7) because it is a claim for damages resulting from the termination of an employment contract.[14] I emphasize that I make no ruling on whether White has an allowable claim, or its amount. I merely hold that if White establishes a claim based on MAWS' breach of his Employment Contract, § 502(b)(7) will limit his claim.

## V. Equitable Subordination under § 510(c).

 MAWS finally argues that White's claim should be equitably subordinated under § 510(c) based on White's criminal conduct. White disagrees that his illegal activities are inequitable for purposes of § 510(c). He claims he always acted for the benefit of MAWS, albeit it turned out illegally, and not for his own personal gain. He characterizes himself as a passive participant in a petty bribery scheme initiated by another employee that involved no more than $1,000 and two junk cars.

I will deny summary judgment on this issue for two reasons. First, White does not yet have an allowed claim. Section 510(c) only permits subordination of "all or

---

14. Accordingly White's claim, if any, is limited to "the compensation provided by [his employment] contract, without acceleration, for one year following the earlier of—(i) the date of the filing of the petition; *or* (ii) the date on which [MAWS] directed [White] to

terminate, or [White] terminated, performance under such contract; *plus* (B) any unpaid compensation due under such contract, without acceleration, on the earlier of such dates." 11 U.S.C. § 502(b)(7).

part of an *allowed* claim" or "*allowed* interest." 11 U.S.C. § 510(c). MAWS' request for equitable subordination is premature.

■■■■ Second, equitable subordination is rarely amendable to resolution on summary judgment. To subordinate a claim under § 510(c), I must examine the facts and circumstances of each case. *Burden v. United States,* 917 F.2d 115, 120 (3d Cir.1990). Here, White and MAWS hotly dispute the relevant facts. Although both parties filed numerous affidavits, deposition testimony, and other material, the admissibility of some of that evidence is questionable. I am also concerned about compromising White's Fifth Amendment privilege or his ability to fairly defend against summary judgment on this issue given the criminal basis of his allegedly inequitable conduct.

I therefore decline MAWS' invitation to hold a "trial by affidavit" and deny the motion for summary judgment on the issue of equitable subordination under § 510(c).

## CONCLUSION

For the reasons set forth above, I grant in part MAWS' motion for summary judgment (Doc. # 1021) on its objection (Doc. # 778; Doc. # 900) to the proof of claim of Christopher White (Claim No. 00420). First, I hold that White has not alleged facts or submitted evidence that establishes a Change of Control at MAWS as defined in his employment contract. I therefor sustain MAWS' objection to White's proof of claim to the extent the claim is based on the Change of Control and "golden parachute" provisions of his Employment Contract. Second, I hold that the entirety of White's remaining claim if any, including his claim for reim-

bursement of attorneys' fees, is subject to the limitations of § 502(b)(7) because it is a claim for damages resulting from the termination of an employment contract. I deny MAWS' motion for summary judgment on all other issues. In closing, I repeat that I make no ruling on whether White has an allowed claim. I merely hold that if White establishes a claim, other than one based on Change of Control, § 502(b)(7) will limit the claim.

## ORDER

For the reasons set forth in the Court's Memorandum Opinion of this date, the motion for summary judgment (Doc. # 1021) by the Plan Administrator of Mid–American Waste Systems, Inc. regarding the proof of claim of Christopher White (Claim No. 00420) is GRANTED IN PART so that the claim of Christopher White (Claim No. 00420) is hereby disallowed (1) to the extent the claim is for compensation based on a "change of control" at Mid–American Waste Systems, Inc. as such term is defined in Christopher White's employment contract dated March 3, 1993, and (2) to the extent the claim exceeds the statutory limitation set forth in 11 U.S.C. § 502(b)(7). This Order does not address whether Christopher White's proof of claim (Claim No. 00420) is otherwise allowed under 11 U.S.C. § 502.